United States District Court
Southern District of Texas

**ENTERED**

January 17, 2023

Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## VICTORIA DIVISION

| | | |
|---|---|---|
| MARK CLIFF SCHWARZER, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 6:18-CV-00034 |
| | § | |
| DALE WAINWRIGHT, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION OF
## UNITED STATES MAGISTRATE JUDGE

Mark Cliff Schwarzer ("Plaintiff"), a Texas inmate proceeding *pro se* and *in forma pauperis*, has filed this prisoner civil rights action pursuant to 42 U.S.C. § 1983. Pending before the Court is a motion to dismiss filed by all but one of the defendants in this case. (Doc. No. 52.) Plaintiff has responded in opposition. (Doc. No. 55.) No reply was filed. For the reasons set forth below, the undersigned recommends that the motion to dismiss be GRANTED IN PART and DENIED IN PART, and that Plaintiff's claims against all of the defendants in their individual capacities be DISMISSED with prejudice.

### A. Jurisdiction.

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. This case has been referred to the undersigned magistrate judge for case management and making recommendations on dispositive motions pursuant to 28 U.S.C. § 636.

While Plaintiff's amended complaint is the operative pleading in this case, in the interests of justice and because Plaintiff is proceeding *pro se*, the undersigned addresses Plaintiff's amended complaint, his original complaint (to the extent that it discusses the surviving issues

1/52

raised in the amended complaint), the attachments appended to his original complaint, and his responses to the district court's questions in the form of a more definite statement. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972) (*pro se* pleadings are to be held to less stringent standards than formal pleadings drafted by lawyers); *see also McDavid v. Thompson*, No. 6:20cv579, 2022 WL 1192783, at *1 (E.D. Tex. Feb. 16, 2022), *adopted*, 2022 WL 636718 (E.D. Tex. Mar. 3, 2022) (citing *Howard v. King*, 707 F.2d 215, 220 (5th Cir. 1983) (discussing liberal construal of pro se plaintiff's original complaint and its attachments after amendment).

### B. Background, procedural history, and the current claims and issues.

Plaintiff is a prisoner in the Texas Department of Criminal Justice, Criminal Institutions Division ("TDCJ"). When Plaintiff filed his original complaint, he was housed at TDCJ's Stevenson Unit, which is located in Dewitt County, in the Victoria Division of Southern District of Texas. 28 U.S.C. § 124(b)(5). Plaintiff is currently confined at the Duncan Unit.[1]

### 1. The relevant facts: Plaintiff's incoming mail is denied on one occasion in January 2018. He appeals the denial, unsuccessfully.

Plaintiff's mother attempted to send two types of printed material to him in prison. The first was a set of blank "character pages," which Plaintiff alleges are used for a computer role-playing game called "World of Warcraft." *See* Doc. No. 11, p. 3. An example of these character pages is attached to Plaintiff's original complaint. *See* Doc. No. 1-3, p. 2. The example page contains ten blank blocks for listing of information, ready to be filled in. Each of these blocks includes spaces for a character's "name," "race," "level," "talents," "class," "skills," "weapons," and "armor." *Id.*

---

[1] After filing this action, Plaintiff filed a Notice of Change of Address, indicating that he had been transferred to TDCJ's Duncan Unit. (Doc. No. 12.) The Duncan Unit is located in Angelina County, in the Lufkin Division of the Eastern District of Texas. 28 U.S.C. § 124(c)(6).

The second type of printed material was a blank phone log, which Plaintiff states would be used to log dates and recipients of telephone calls and the funds expended for those calls. Plaintiff states that he uses these logs because the company through which calls are made fails to provide statements.  (Doc. No. 11, p. 2.)  An example of these telephone logs is attached to Plaintiff's original complaint.  *See* Doc. No. 1-1.[2]  All together, Plaintiff's mother attempted to send a total of 28 pages of printed materials.  (Doc. No. 1-5, p. 2.)

The printed materials were received at the prison on January 10, 2018.  The following day, Plaintiff was given a "Correspondence / Contraband Denial Form," notifying him that the mailed materials had "been denied to you in accordance with BP-03.91, Uniform Offender Correspondence Rules."  (Doc. No. 1-5, p. 2.)[3]  The Denial Form contains a series of check-boxes, which prison officials use to notify the prisoner of the "cause or causes for denial."  Those check-box options include "Content" and "Contraband," among others.  Only the "Content" check-box on Plaintiff's form was marked, not "Contraband" or any other check-box.  *Id.*

The Denial Form informed Plaintiff of his right to appeal the denial, with the following pre-printed language:

**APPEAL**:

Should the offender decide to appeal the rejection of said correspondence/contraband, he/she must notify the Unit Mailroom **WITHIN TWO (2) WEEKS** of offender notification requesting that this correspondence/contraband and the rejection form be forwarded to the Director's Review Committee (DRC).

---

[2]  The example of the phone logs depicts "filled-in" logs, but the material Plaintiff's mother tried to send consisted only of blank logs for future use.  *See* Doc. No. 11, pp. 2-3.

[3]  This document is also attached to Plaintiff's original complaint.

(Doc. No. 1-5, p. 2) (emphasis in original).  Plaintiff indicated that he wished to appeal the

decision.  *Id.*

The DRC rejected Plaintiff's appeal.  In an unsigned "Decision Form" dated February 5,

2018, the DRC stated as follows:

> The Director's Review Committee (DRC) has rendered a decision regarding your
> appeal of the Unit rejection of 28 printed pgs of game sheets and phone logs
> received in contradiction with BP-03.91, Uniform Offender Correspondence Rules.
>
> …
>
> It is the decision of the DRC to **uphold** the Unit rejection of the above mentioned
> item(s).  You will have 60 days from the above date to make disposition of the
> denied item unless security mandates there is no disposition.

(Doc. No. 1-6, p. 2.)[4]  Plaintiff has alleged no other denial of any mail other than this January 11,

2018 denial.

Plaintiff alleges that, although the denial form does not provide further explanation of the

reason the character pages were denied, a mailroom worker "mentioned something about the

papers being [stationery].  Later, my mother was told the DRC upheld the decision because

gaming is not allowed in TDCJ."  (Doc. No. 11, p. 3.)  Plaintiff added that the mailroom worker

"was not sure and supposedly wanted to confirm.  When the DRC did not claim they were

[stationery], the forms should have been returned.  Instead they opined that gaming is not

allowed in TDCJ.  A clear and obvious violation of my freedom of speech."  *Id.* at 4.  Plaintiff

also submitted an undated, unsigned "affidavit," supposedly from his mother, stating that she had

spoken with a mailroom worker who told her that the character sheets had been denied "because

they were not allowed to play games and they were considered stationery."  (Doc. No. 11-3.)

---

[4]  This document is also attached to Plaintiff's original complaint.

4/52

### 2. *Board Policy 03.91.*

The policy cited on the denial form and in the DRC's decision form is Board Policy ("BP") 03.91, *Uniform Offender Correspondence Rules*.  Plaintiff attached a copy of that policy to a motion he filed in the district court in 2019.  *See* Doc. No. 17-1.  The policy has since been revised, most recently in 2021.  The undersigned takes judicial notice of the 2017 version of BP-03.91 here, noting that no party has challenged its authenticity.  The 2021 version of BP-03.91 is attached as Appendix A to this memorandum and recommendation.[5]  The undersigned takes judicial notice of the revised policy as well; where relevant differences between the two versions exist, the undersigned discusses them in this memorandum and recommendation.  Except as specifically noted, all references to BP-03.91 are to the version that was in effect at the time of the 2018 denial of Plaintiff's mailed items.

The "board" referenced in the policy is the Texas Board of Criminal Justice ("TBCJ," or the "Board").  *See* Doc. No. 17-1, p. 14.  The nine-member Board is "appointed by the Governor to oversee the Texas Department of Criminal Justice (TDCJ), which provides confinement, supervision, rehabilitation, and reintegration of the state's convicted felons.  Board members, who are appointed for staggered, six-year terms, are responsible for hiring the executive director of the department and settings rules and policies which guide the agency."[6]  The Texas Government Code directs the Board to "develop and implement policies that clearly separate the policymaking responsibilities of the board and the management responsibilities of the executive director and the staff of the department."  Tex. Gov't Code § 492.013(e).

---

[5]  The 2021 version of the BP-03.91 is also available online at
https://www.tdcj.texas.gov/documents/policy/BP0391.pdf (last visited Jan. 9, 2023).

[6]  *See* Texas Board of Criminal Justice, *Overview*, https://www.tdcj.texas.gov/tbcj/index.html (last visited Jan. 8, 2023).

Among other things, BP-03.91 sets forth rules and instructions regarding correspondence to and from inmates confined in TDCJ facilities.  As relevant here, BP-03.91 provides for content inspection of general correspondence[7] by mailroom staff:

> All general correspondence shall be subject to the right of inspection and rejection by unit mailroom staff.  All outgoing or incoming letters to and from offenders and enclosures such as clippings, photographs, or similar items, shall be disapproved for mailing or receipt if the content falls as a whole, or in significant part, into any of the categories listed below:

1. Contains threats of physical harm against any person or place or threats of criminal activity;

2. Threatens blackmail or extortion;

3. Concerns sending contraband in or out of the institution;

4. Concerns plans for escape or unauthorized entry;

5. Concerns plans for activities in violation of institutional rules;

6. Concerns plans for future criminal activity;

7. Uses code and its contents are not understood by the person inspecting the correspondence;

8. Solicits gifts of goods or money under false pretenses or for payment to other offenders;

9. Contains a graphic presentation of sexual behavior that is in violation of the law;

10. Contains a sexually explicit image;

11. Contains an altered photo;[[8]]

---

[7]  Under BP-03.91, "general" correspondence includes all correspondence that does not qualify as legal mail, correspondence with the media, or "special correspondence" (as defined in the policy).  *See* Doc. No. 17-1, pp. 2-3. There appears to be no dispute that the items denied to Plaintiff in this case were "general" correspondence, and not "legal," "media," or "special" correspondence.

[8]  The 2021 revision of BP-03.91 contains a more detailed definition: "Contains an altered photo or a photo that conceals or hides the face of the individual photographed in a manner that prevents identification of that individual." (Appendix A, p. 10.)

12. Contains information which, if communicated, would create a clear and present danger or violence or physical harm to a human being; or

13. Contains records or documentation held by the TDCJ that are not listed in the attachment to the TDCJ *Public Information Act Manual* Chapter 2.

(Doc. No. 17-1, pp. 9-10.)

BP-03.91 prescribes what occurs upon disapproval of correspondence:

The offender and the sender or addressee shall be provided a written statement of the disapproval and a statement of the reason for disapproval within three business days after receiving the correspondence.   The notice shall be given on Correspondence Denial Forms.  The offender shall be given a sufficiently detailed description of the rejected correspondence to permit effective use of the appeal procedures.  The offender, sender, or addressee may appeal the mailroom staff's decision through the procedures outlined in this policy.  The offender or sender may submit a written argument as to why the item should not be denied for the DRC's consideration.

(Doc. No. 17-1, p. 10.)  The policy also provides additional detail about the appeal procedure:

Any offender, other correspondent, or sender of a publication may appeal the rejection of any correspondence or publication.  They may submit written evidence or arguments in support of their appeal.  …

1.  Appeal procedures.

A written notice of appeal, including justification, shall be sent to the DRC within two weeks of notification of rejection.   Upon receipt of notification, the correspondence or publication in question shall be sent to the DRC.

2.  Final decision.

The DRC shall render its decision within two weeks after receiving the appeal, and shall issue written notification of the decision to the parties involved within two business days.

3.  Delegation

The DRC chairman may delegate decisions regarding correspondence and publication denials to the MSCP,[9] which shall be governed by the guidelines applicable to the DRC regarding appeals.

---

[9] The MSCP is the "Mail System Coordinators Panel," described in BP-03.91 as "the body designated to assist in the maintenance and coordination of the Uniform Offender Mail System.  The MSCP serves to bring uniformity to

(Doc. No. 17-1, pp. 13-14.)  The 2021 version of BP-03.91 adjusted the DRC appeal procedures somewhat.  For denied correspondence, a "written notice of appeal, including justification, shall be sent to the DRC within two weeks of notification of the denial of correspondence . . . ." (Appendix A, p. 14.)

BP-03.91 also addresses "stationery," which it defines as "paper and envelopes, to include carbon paper, purchased through the unit commissary by the offender, provided through the indigent correspondence supply program, or purchased by offender families and friends through the eCommDirect program."  (Doc. No. 17-1, p. 4.)[10]  Prisoners may use for correspondence "[a]ny type of stationery, whether bought at the commissary, purchased through the eCommDirect program, or authorized for issuance to indigent offenders."  *Id.* at 7.  But the policy also provides: "Offenders are not allowed to receive packages containing stationery supplies."  *Id.* at 6.

### 3. *Plaintiff's original complaint and litigation.*

Plaintiff named the following defendants in his original complaint: Dale Wainwright, Robert Beard, Jr., Pamela R. Mendez-Banda, Bryan Collier, and Jennifer Smith ("Original Defendants").  (Doc. No. 1.)  Plaintiff sought declaratory, injunctive, and equitable relief.  *Id.* at 9.

---

the decisions of the various units by providing technical assistance and rule interpretation; serves as the centralized authority for the review of publications for initial unit acceptance or denial; provides training for mailroom staff; conducts in-depth monitoring of all unit mailrooms; and submits periodic reports pertaining to the offender mail system."  (Doc. No. 17-1, p. 2.)  There is no evidence that Plaintiff's DRC appeal in this case was delegated to the MSCP, and Plaintiff does not so allege.

[10]  This is a "program made available through a link on the TDCJ website or the Texas.gov website by which offender family and friends may purchase items and have the items delivered to offenders through the unit commissary."  *Id.* at 2.

Plaintiff's original complaint contained several allegations.  (Doc. No. 1.)  Plaintiff alleged that the Original Defendants improperly denied his mail, which consisted of phone tracking sheets and forms used for a role-playing game.  *Id.* at 6.  Plaintiff stated that these materials were confiscated as stationery and deemed contraband.  *Id.*  Plaintiff alleged that the DRC upheld this denial and concluded that the forms in question contradicted BP-03.91.  *Id.* at 7. Plaintiff asserted that this decision was arbitrary, and that the Original Defendants denied Plaintiff due process by failing to follow their own grievance procedures. *Id.* at 8.

The district court ordered Plaintiff to provide a more definite statement regarding his claims.  (Doc. No. 8.)  Plaintiff did so.  (Doc. No. 11.)  Among Plaintiff's responses to the district court's questions was a statement that the violation of his constitutional rights occurred on January 11, 2018, when prison officials "improperly denied my mail, . . . in violation of speech under the First Amendment."  *Id.* at 1.  Plaintiff stated that his due process was denied on February 13, 2018, when the DRC failed to fairly resolve Plaintiff's appeal of that denial, and again on March 12, 2018, when prison officials denied Plaintiff's grievance about the mail denial.  *Id.*

The district court construed Plaintiff's original complaint as asserting the following claims: (1) a denial of access to the courts, (2) an interference with correspondence based on the prison's inspection of his mail, and (3) a due process violation based on the prison's failure to comply with its own rules and regulations regarding the grievance process.  (Doc. No. 14.)  The district court dismissed these claims with prejudice as frivolous pursuant to 28 U.S.C. § 1915(e)(2)(B)(i).  *Id.* at 6.

Plaintiff appealed the dismissal to the United States Court of Appeals for the Fifth Circuit.  (Doc. No. 19.)  The Fifth Circuit considered whether the district court properly

dismissed Plaintiff's § 1983 claims as frivolous.  *See Schwarzer v. Wainwright*, No. 19-41011, 2021 WL 6060002, at *1 (5th Cir. Dec. 17, 2021).  First, the court liberally construed Plaintiff's First Amendment claims as asserting that "(1) the prison's policy of prohibiting inmates from receiving stationery supplies via mail violates the First Amendment and (2) the defendants violated his First Amendment rights by denying his mail based on Board Policy 03.91."  *Id.*

The court of appeals held that these First Amendment claims could not be dismissed as frivolous, because the record did not demonstrate whether Plaintiff's claims regarding the prison's mail policies were "based on an indisputably meritless legal theory."  *Id.* (citing *Harper v. Showers*, 174 F.3d 716, 718 (5th Cir. 1999)).  The Fifth Circuit explained that *Turner v. Safley* provides the proper framework in making this determination, which asks whether the prison's policy regarding mail censorship is "reasonably related to legitimate penological interests."  *See id.*; *see also Turner v. Safley*, 482 U.S. 78, 89 (1987).

The Fifth Circuit affirmed the dismissal of Plaintiff's due process claim, which alleged that the Original Defendants failed to follow prison rules related to the grievance procedure, because the claim did not present a constitutional violation.  *Schwarzer*, 2021 WL 6060002, at *1 (citing *Samford v. Dretke*, 562 F.3d 674, 681 (5th Cir. 2009)).

The court of appeals additionally held that Plaintiff, as a *pro se* litigant, should have been afforded an opportunity to amend his complaint before the district court dismissed his claims with prejudice.  *See Schwarzer*, 2021 WL 6060002, at *1-2 (citing *Brewster v. Dretke*, 587 F.3d 764, 767-68 (5th Cir. 2009)).  Plaintiff asserted in his appellate brief that he was not permitted to participate in the DRC process for reviewing denials of mail, and that he was therefore deprived of his First Amendment rights without due process.  *Id.*  The court of appeals concluded that

Plaintiff could have amended his complaint to allege this nonfrivolous procedural due process claim. *Id.* at *2.

For these reasons, the court of appeals vacated the district court's judgment and remanded in part for further proceedings with respect to Plaintiff's First Amendment free speech and procedural due process claims. *Id*. The judgment was affirmed in all other respects. *Id.*

### 4. *The amended complaint and the Court's screening.*

In light of the Fifth Circuit's remand, the undersigned directed Plaintiff to file an amended complaint setting forth the factual basis in support of his First Amendment free speech claims pertaining to the prison's policy of the receipt of stationery supplies via mail and the denial of such mail pursuant to BP-03.91, and his procedural due process claims in connection with his participation in the DRC's process for reviewing denials of mail.  (Doc. No. 43, p. 4.) The undersigned further instructed Plaintiff to list the defendant or defendants he seeks to sue with respect to these two claims, to clearly state the remedies he seeks against each listed defendant, and to set forth whether he sues each defendant in his or her individual capacity, official capacity, or both. *Id.*

Plaintiff then filed his amended complaint, naming the following defendants: (1) Dale Wainwright, former Chairman of the TBCJ; (2) Patrick O'Daniel, TBCJ's current Chairman; (3) Derrelynn Perryman, TBCJ's Vice-Chairman; (4) Larry Miles, TBCJ's Secretary; (5) E. F. DeAyala, TBCJ member; (6) Molly Francis, TBCJ member; (7) Faith Johnson, TBCJ member; (8) Sichan Siv, TBCJ member; (9) Eric Nichols, TBCJ member; (10) Rodney Burrow, TBCJ member; (11) Bryan Collier, TDCJ's Executive Director; (12) Bobby Lumpkin, Director of TDCJ's Correctional Institutions Division; (13) Leonard Echessa, Director of the DRC; (14) Jennifer Smith, (then-)Program Supervisor of the DRC; (15) Arica D. Flores, Mailroom

Supervisor at the Stevenson Unit; (16) Chris Norseworthy, former Warden at the Duncan Unit; and (17) Stacie A. Walton, Mailroom Supervisor at the Duncan Unit.[11]  (Doc. No. 45, p. 3; Doc. No. 45-1, pp. 1-3.)

Plaintiff's amended complaint, however, also contained numerous allegations that were beyond the scope of the Fifth Circuit's remand and the undersigned's order directing the amended complaint.  *See* Doc. No. 47, pp. 7-9.  The undersigned recommended that those claims be disregarded and stricken from the amended complaint, along with Plaintiff's requests for relief relating to those extraneous claims.  *Id.* at 9-10.  The undersigned also recommended dismissal of Defendants Norseworthy and Walton without prejudice, because Plaintiff's allegations regarding those defendants involved actions that occurred outside the Southern District of Texas.  *Id.* at 10.  The district court overruled Plaintiff's objections to the memorandum and recommendation and adopted it in full.  (Doc. No. 56.)

### 5.  *The remaining claims.*

After screening, then, the remaining claims are Plaintiff's First Amendment allegations that he was wrongly denied mail in the form of the blank character sheets and telephone log forms, and that BP-03.91 violates his free speech rights insofar as it prohibits inmates from receiving stationery supplies through the mail.  *See* Doc. No. 47, p. 13 (undersigned's recommendations regarding disposition); Doc. No. 56, pp. 5-6 (district court order adopting those recommendations).  Also remaining is Plaintiff's procedural due process allegation that he was denied the opportunity to be heard regarding the denial of that mail.  *See* Doc. No. 47, pp.

---

[11]  Plaintiff did not name Original Defendants Beard or Mendez-Banda as defendants in his Amended Complaint. Upon the undersigned's recommendation, the district court dismissed those defendants from this action.  (Doc. No. 56, p. 6.)

18-19 (undersigned's recommendations regarding disposition); Doc. No. 56, pp. 5-6 (district

court order adopting those recommendations).

With regard to each remaining defendant, the claims are organized as follows:

- First Amendment claim against the TBCJ Board member defendants (O'Daniel, Perryman, Miles, DeAyala, Francis, Johnson, Siv, Nichols, and Burrow) and defendants Flores, Echessa, and Smith in their individual capacities, for monetary relief;

- First Amendment claim against defendants the TBCJ Board member defendants O'Daniel, Perryman, Miles, DeAyala, Francis, Johnson, Siv, Nichols, and Burrow) and defendants Collier and Lumpkin in their official capacities, for injunctive and declaratory relief;

- Procedural due process claim against defendants Echessa and Smith in their individual capacities, for monetary relief; and

- Procedural due process claim against defendant Echessa in his official capacity, for injunctive and declaratory relief.

The following requested relief remains:

- A declaration that the defendants' actions violated Plaintiff's rights under the Constitution and Laws of the United States;

- Prospective injunctive relief "restoring access to outside vendors that families and friends may purchase [stationery] for inmates;"

- Prospective injunctive relief to allow inmates "to provide input to DRC hearings / decision process;"

- Monetary relief of $10,000 for the "arbitrary finding that blank forms are contraband" (against Defendants Echessa and Smith);

- Monetary relief of $10,000 for the "denial of affordable [stationery] from external sources since 2014" (against Defendant Wainwright);

- Monetary relief of $20,000 for the "costly restrictions" of stationery (against TBCJ board members);

- Monetary relief of $10,000 for the "violations that deprived Plaintiff his First Amendment rights" (against Defendant Flores);

- Prejudgment and postjudgment interest "on actual and punitive damages;" and

- "All other relief the court deems appropriate."

(Doc. No. 45-1, pp. 16-18.)

### 6. The motion to dismiss and Plaintiff's response.

All but one of the defendants have moved to dismiss Plaintiff's action.  (Doc. No. 52.)[12]

These defendants contend that the Court lacks subject matter jurisdiction over any claims

brought against the defendants in their official capacities, because of Eleventh Amendment

immunity.  (Doc. No. 52, pp. 4-7; *see* Fed. R. Civ. P. 12(b)(1).)  The defendants also claim that

Plaintiff has failed to state a claim upon which relief may be granted (*see* Fed. R. Civ. P.

12(b)(6)), because:

- BP-03.91 is not unconstitutional, so no First Amendment violation occurred when the mail items were denied (Doc. No. 52, pp. 8-10);

- The Board member defendants were not personally involved in the denial of these specific mail items, so they cannot be held personally liable (*id.* at 10-13);

- Defendants Collier and Lumpkin were not personally involved in the denial of these specific mail items or in the promulgation of BP-03.91, so they cannot be held personally liable (*id.* at 13-14);

- Regardless of the Board Policy's provisions, no First Amendment violation occurred because Plaintiff failed to allege an "injury-in-fact" (*id.* at 14-16);

- No procedural due process violation occurred, because Plaintiff had an adequate state post-deprivation remedy and in any event was given an opportunity to be heard during the DRC appeal process (*id.* at 16-18); and

- The defendants are entitled to qualified immunity against Plaintiff's claims lodged against them in their individual capacities (*id.* at 18-21).

---

[12]  The Texas Attorney General filed this dismissal motion on behalf of all of the defendants except Smith. Defendant Smith, the Attorney General states, is no longer an "active employee" of the Texas Department of Criminal Justice; the Attorney General's Office states that it does not have the authority to waive service on her behalf.  (Doc. No. 53.)  Defendant Smith has not been served in this case and has not entered an appearance.

14/52

Plaintiff filed a response to the dismissal motion.  (Doc. No. 55.)  Liberally construed, Plaintiff argues that BP-03.91 is indeed unconstitutional, that the Board members' participation in the promulgation of that unconstitutional policy suffices to trigger their liability in their official capacities, that his First Amendment rights were violated when the mailed items were denied, and that he was not given any meaningful opportunity to provide input into the DRC's review of the denied mail.  *See id.* at 1-7.  The moving defendants did not file a reply to Plaintiff's response.

### C.  The Rule 12(b)(1) motion.

The defendants seek dismissal of Plaintiff's claims against them in their official capacities pursuant to Federal Rule of Civil Procedure 12(b)(1).  Their argument is based on immunity from suit which, the defendants assert, is conferred by the Eleventh Amendment. (Doc. No. 52, pp. 8-10.)  For the reasons discussed below, the undersigned agrees in part.

### 1.  Dismissal motions under Rule 12(b)(1).

The undersigned considers the defendants' Rule 12(b)(1) motion before considering the other attacks on Plaintiff's complaint.  This is because a Rule 12(b)(1) jurisdictional attack, when filed in conjunction with other Rule 12 motions, should be considered before addressing any attack on the merits.  *Block v. Tex. Bd. of Law Examiners*, 952 F.3d 613, 616-17 (5th Cir. 2020) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

Dismissal of a complaint for lack of subject matter jurisdiction is proper only when the claim is "'so completely devoid of merit as not to involve a federal controversy.'"  *Ghedi v. Mayorkas*, 16 F.4th 456, 463 (5th Cir. 2021) (quoting *Brownback v. King*, __ U.S. __ 141 S. Ct. 740, 749 (2021) (internal quotation and citation omitted)).  A claim fails that test when the

plaintiff does not "plausibly allege all jurisdictional [elements]." *Ghedi*, 16 F.4th at 463 (quoting *Brownback*, 141 S. Ct. at 749).

In evaluating a motion to dismiss under Rule 12(b)(1), the court accepts as true those well-pleaded factual allegations in the complaint and views them in the light most favorable to the plaintiff. *Stratta v. Roe*, 961 F.3d 340, 349 (5th Cir. 2020). The court may consider the complaint alone, the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts. *Id.* (citing *Ramming*, 281 F.3d at 161). "When considering a Rule 12(b)(1) motion, a district court may go beyond the pleadings to affidavits and other evidence to determine its jurisdiction." *Adams v. Pearl River Valley Water Supply Dist.*, No 21-60749, 2022 WL 2829756, at *2 (5th Cir. July 20, 2022) (unpublished) (citing *Williamson v. Tucker*, 645 F.2d 404, 413-14 (5th Cir. 1981)).

### 2. Sovereign immunity and the Eleventh Amendment.

The Eleventh Amendment to the United States Constitution provides that the judicial power of the United States "shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. "In most cases, Eleventh Amendment sovereign immunity bars private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019), *cert. denied*, __ U.S. __, 141 S. Ct. 1047 (2021). This sovereign immunity "also prohibits suits against state officials or agencies that are effectively suits against a state – thus, suits against state officers in their official capacities are also subject to the sovereign immunity bar. *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651, 663-69 (1974)). Unless the state has waived sovereign immunity, or unless Congress

has abrogated it, the Eleventh Amendment bars Plaintiff's suit against the defendants in their official capacities, because a suit against a state official in his or her official capacity is not against the official but is rather a suit against the official's office – it is no different from a suit against the state itself.  *Paxton*, 943 F.3d at 997 (citing *AT&T Commc'ns v. Bellsouth Telecomms. Inc.*, 238 F.3d 636, 644-45 (5th Cir. 2001)); *Morris v. Livingston*, 739 F.3d 740, 745 (5th Cir. 2014).  In this case, the moving defendants, represented by Texas' Attorney General's Office, assert that Texas has not waived its sovereign immunity to suit or otherwise consented to it.  (Doc. No. 52, p. 5.)  Nor, the dismissal motion states, has Congress abrogated Texas' sovereign immunity.  *Id.*  Plaintiff does not contend otherwise in his response to the dismissal motion.

An exception to the sovereign immunity rule, however, was established in *Ex parte Young*, 209 U.S. 123 (1908).  The *Ex parte Young* exception allows a plaintiff, as a matter of equity, "to sue individual state officials for prospective relief – a legal fiction that skirts around the Eleventh Amendment."  *Block*, 952 F.3d at 619; *see also Air Evac EMS, Inc. v. Tex. Dept. of Ins., Div. of Workers' Compensation*, 851 F.3d 507, 515-16 (5th Cir. 2017).  The Supreme Court stated that individuals "who, as officers of the State, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties affected an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action."  209 U.S. at 155-56.  To avoid the apparent conflict with the concept of sovereign immunity, the court created a "legal fiction," that "a federal court does not violate state sovereignty when it orders a state official to do nothing more than uphold federal law under the

Supremacy Clause." *Air Evac EMS*, 851 F.3d at 516 (citing *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011)).

"Because this legal fiction infringes on state sovereignty, *Ex parte Young* and its progeny limit the exception." *Air Evac EMS*, 851 F.3d at 516.  The exception is limited only to violations of the United States Constitution and federal statutes, *see Pennhurst State Sch. and Hosp. v. Halderman*, 465 U.S. 89, 104-06 (1984), and provides only for prospective relief.  *Air Evac EMS*, 851 F.3d at 517 (citing *Edelman*, 415 U.S. at 677).  A reviewing court must conduct a "straightforward inquiry" into the pleadings and determine whether the complaint "alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Public Svc. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (quoting *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 296 (1997) (O'Connor, J., joined by Scalia and Thomas, JJ., concurring in part and concurring in judgment)).

An "ongoing" violation of federal law is different from a past, completed violation.  The *Ex Parte Young* exception applies only to prospective relief and does not permit judgments against state officers declaring that they violated federal law in the past.  *Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993); *McClure v. Torres*, No. 9:16-CV-53, 2020 WL 8972224, at *6 (E.D. Tex. Dec. 21, 2020), *adopted*, 2021 WL 1123332 (E.D. Tex. Mar. 23, 2021).

Importantly, a defendant must have "some connection" to the enforcement of the challenged state law and threaten to exercise that authority, for the *Ex parte Young* exception to apply.  *See Air Evac EMS*, 851 F.3d at 517 (citing *Young*, 209 U.S. at 157); *see also In re Abbott*, 956 F.3d 696, 708-09 (5th Cir. 2020) (exception permits suits against state officials, "provided they have sufficient 'connection' to enforcing an allegedly unconstitutional law").  Merely being

sued as a representative of the state, such as a person with a "broad duty to uphold state law," will not suffice. *Id.* (citing *Morris v. Livingston*, 739 F.3d 740, 745-46 (5th Cir. 2014)).  And where a "state actor or agency is statutorily tasked with enforcing the challenged law and a different official is the named defendant, our *Young* analysis ends." *Paxton*, 943 F.3d at 998.  "If the official sued is not 'statutorily tasked with enforcing the challenged law,' then the requisite connection is absent and 'our *Young* analysis ends.'" *Abbott*, 956 F.3d at 709 (citing *Paxton*, 943 F.3d at 998).  "The power to promulgate law is not the power to enforce it." *Abbott*, 956 F.3d at 709 (citing *Martin v. Occupational Safety & Health Review Comm'n*, 499 U.S. 144, 152 (1991).

### 3. The "denial of mail" claim: the Eleventh Amendment bars Plaintiff's First Amendment claim against the TBCJ Board members and defendants Collier and Lumpkin in their official capacities.

Plaintiff's First Amendment mail-denial claim against the Board members and defendants Collier and Lumpkin in their official capacities should be dismissed without prejudice.  Plaintiff fails to plausibly allege that those defendants play any role in the enforcement of BP-03.91.  The policy itself prescribes who is responsible for its enforcement, and neither the Board members nor defendants Collier or Lumpkin are part of that group.

The Board promulgated BP-03.91, but the Board members' promulgation does not equate to enforcement of that policy. *See Abbott*, 956 F.3d at 709.  Instead, enforcement falls to the "unit mailroom staff," with the DRC fielding appeals.  (Doc. No. 17-1, pp. 9, 10, 13-14.)

In this case, the denial of Plaintiff's incoming correspondence was based on the items' "content." *See* Doc. No. 1-5, p. 2 (on denial form, "content" check-box marked, not "contraband" or any other ground for denial).  BP-03.91 provides specifically that decisions regarding denial of correspondence based on that correspondence's content are made by "unit mailroom staff."  (Doc. No. 17-1, p. 9.)  The decision of the unit mailroom's staff may be

appealed to the DRC.  *Id.* at 10, 13-14.  BP-03.91 does not articulate any enforcement role for any member of the Texas Board of Criminal Justice.  Indeed, the Texas Government Code specifically directs the Board to promulgate regulations to "clearly separate" Board members' policymaking responsibilities from the management responsibilities, which are assigned to the Texas Department of Criminal Justice.  *See* Tex. Gov't Code § 492.013(e).  Because BP-03.91 specifically assigns enforcement responsibilities elsewhere, and because there is no other allegation or indication that any Board member plays any role in the enforcement of BP-03.91, the undersigned concludes that *Ex parte Young*'s sovereign immunity exception does not apply to any of the Board member defendants in this case.  *Cf. Paxton*, 943 F.3d at 998; *Morris*, 739 F.3d at 745-46; *Schwarzer v. Lumpkin*, No. 6:18-cv-00029, 2021 WL 4438143, at *6 (S.D. Tex. Sept. 28, 2021) (Tipton, J.).  The undersigned therefore recommends that Plaintiff's claims against Defendants O'Daniel, Perryman, Miles, DeAyala, Francis, Johnson, Siv, Nichols, and Burrow, regarding the specific denial of his mail, be DISMISSED without prejudice for lack of subject matter jurisdiction.

Likewise, defendants Collier (TDCJ's Executive Director) and Lumpkin (the Executive Director of TDCJ's Correctional Institutions Division) are not part of the unit mailroom staff, and Plaintiff does not plausibly allege that either is a member of the DRC or otherwise plays any personal role in the enforcement of BP-03.91.  Rather, Plaintiff claims merely that defendant Collier generally "has a duty to protect inmates from constitutional violations" but has failed to provide relief from "onerous mail restrictions, mail fraud, unlawful seizures, cruel and unusual punishment and due process."  (Doc. No. 45-1, p. 14.)  Plaintiff claims that defendant Lumpkin "is responsible for the inmates under his care," including "safety from officials that deprive inmates of their constitutional rights.  As a director, Lumpkin would be aware of the mail

20/52

violations by overzealous clerks but did nothing to intervene." *Id.* For purposes of the *Ex parte Young* exception, it is not enough to allege merely that these defendants have a general duty to see that policies like BP-03.91 are implemented in a constitutional manner. *See Tex. Democratic Party v. Abbott*, 961 F.3d 389, 400-01 (5th Cir. 2020) (citing *Morris*, 739 F.3d at 746). The gravamen of the legal fiction that is the *Ex parte Young* exception is that a federal court may enjoin a state official "to do nothing more than uphold federal law under the Supremacy Clause." *Air Evac EMS*, 851 F.3d at 516. Here, there is no allegation that defendants Collier or Lumpkin themselves play any role in the enforcement of BP-03.91; there is therefore no indication that any federal injunction directed at either of them would result in the upholding of federal law. Collier and Lumpkin, therefore, are not proper defendants in this case, and do not qualify for inclusion under the *Ex parte Young* exception as defendants in their official capacities. The undersigned therefore recommends that Plaintiff's claims against Collier and Lumpkin in their official capacities be DISMISSED without prejudice for lack of subject matter jurisdiction.

### 4. The "stationery" claim: the Eleventh Amendment does not bar Plaintiff's First Amendment claim against the TBCJ Board members in their official capacities. But it does bar Plaintiff's claim against defendants Collier and Lumpkin.

The undersigned has concluded that the TBCJ Board members are immune from suit with regard to the actual denial of Plaintiff's mail in 2018, because Plaintiff fails to plausibly allege that the Board members play any role in the actual enforcement of BP-03.91. In its opinion, however, the Fifth Circuit liberally construed Plaintiff's complaint to include an allegation that BP-03.91 violates his First Amendment free speech rights by prohibiting inmates from receiving packages containing stationery items through the mail. *Schwarzer*, 2021 WL 6060002, at *1. This Court has similarly construed Plaintiff's amended complaint as including such an

allegation.  As discussed next, the Eleventh Amendment does not immunize the TBCJ Board members from suit in their official capacities with regard to that allegation.

The Board is tasked with policymaking and with governing the Texas Department of Criminal Justice.  *See* Tex. Gov't Code §§ 492.001, 492.013(e).  The Board promulgated BP-03.91, which includes a provision that prisoners may not receive packages containing stationery through the mail.  *See* Doc. No. 17-1, pp. 6, 14; Appendix A, pp. 7, 15.  That policy provision, Plaintiff claims, is unconstitutional, because it allegedly violates his free speech rights.  Contrary to the dismissal motion's assertion (Doc. No. 52, pp. 6-7), this allegation is different from one claiming a one-time past denial of mail.  Rather, the Board's continuing oversight responsibility for, and revision of, BP-03.91 indicates to the undersigned that this allegation assails an ongoing violation of federal law: the continuing maintenance of an allegedly unconstitutional policy. Moreover, Plaintiff seeks injunctive relief that is clearly prospective in nature.  He asks for "relief that restores access to outside vendors that families and friends may purchase [stationery] for inmates."  *See* Doc. No. 45-1, p. 16; *cf. Paxton*, 943 F.3d at 998.  For this reason, the undersigned concludes that the TBCJ Board members are not immune from suit under the Eleventh Amendment.

The undersigned finds support for this conclusion in *Haverkamp v. Linthicum*, 6 F.4th 662 (5th Cir. 2021).  There, the *pro se* prisoner plaintiff brought an equal protection claim against TDCJ for failing to provide the plaintiff with sex-reassignment surgery.  At a hearing in that case, discussion arose as to whether the proper defendants had been named.  Counsel for the State of Texas told the court that the appropriate defendants hinged on the type of relief sought by the plaintiff: if the plaintiff were seeking the surgery itself, then the proper defendant, counsel said, would be the relevant physician, but if the plaintiff were seeking "a policy change or a new

policy for transgender inmates, the appropriate defendants would be the principal members of the "Correctional Managed Health Care . . . committee." *Haverkamp*, 6 F.4th at 666. In a subsequent amended complaint, plaintiff Haverkamp sued members of that committee, but requested only the surgery, not a policy change; indeed, the plaintiff sought to invoke the existing policy in order to obtain the surgery. *Id.* at 666-67. The Fifth Circuit found that the committee members were immune from suit under the Eleventh Amendment because Haverkamp did not plausibly allege a connection between the committee members and the decision to deny surgery. *Id.* at 670.

Here, Plaintiff's liberally construed allegation is that the TBCJ Board members have promulgated – and continue to maintain – an unconstitutional policy. Plaintiff's requested relief is a prospective change to that policy. Thus, the undersigned concludes that Plaintiff's allegation adequately pleads for injunction granting a change in policy by the people who are tasked with promulgating that policy. The undersigned therefore recommends that the Board members' motion to dismiss under Rule 12(b)(1) be DENIED to the extent that they seek dismissal of Plaintiff's claim that BP-03.91's ban on receiving stationery through the mail violates his First Amendment rights.

The *Ex parte Young* exception for this stationery claim does not apply, however, with regard to defendants Collier and Lumpkin. The undersigned has liberally construed Plaintiff's complaint as lodging an allegation against defendants Collier and Lumpkin in their official capacities regarding prohibition on receipt of stationery. Those defendants, however, are not part of the Texas Board of Criminal Justice, and Plaintiff does not allege that either has any role in the promulgation of BP-03.91. Nor does Plaintiff allege that either defendant plays any role in the enforcement of the policy. Because Plaintiff fails to plausibly allege any connection between

23/52

defendants Collier and Lumpkin and the promulgation or prospective enforcement of the

allegedly unconstitutional policy, the *Ex parte Young* exception to sovereign immunity does not

apply, and the Eleventh Amendment bars the suit against those defendants in their official

capacities.  The undersigned therefore recommends that the Rule 12(b)(1) motion seeking

dismissal of Plaintiff's First Amendment stationery claim against defendants Collier and

Lumpkin in their official capacities be GRANTED, and that the claim against them be

DISMISSED without prejudice.

### 5.  *The Eleventh Amendment bars Plaintiff's procedural due process claim against Echessa in his official capacity.*

The Court has construed Plaintiff's complaint to include a procedural due process claim

against defendant Echessa in his official capacity.  (Doc. No. 56, p. 5; Doc. No. 47, p. 20.)

Plaintiff's procedural due process claim regarding the denial of his mail rests on a single incident

that occurred in early 2018.  *See* Doc. No. 1, p. 6; Doc. No. 11, p. 1; Doc. Nos. 45, 45-1.

Echessa is alleged to be director of the DRC.  (Doc. No. 45-1, p. 2.)  The DRC upheld the denial

of the items mailed to Plaintiff.  (Doc. No. 1-6.)

The *Ex parte Young* exception cannot be applied to allegations of past wrongs.  The

exception to the sovereign immunity bar applies only to allegations of ongoing violations of

federal law.  *See Harrison v. Young*, 48 F.4th 331, 338 (5th Cir. 2022).  To the extent that

Plaintiff's complaint can be liberally construed as suing Echessa in his official capacity based on

the now-completed single alleged denial of due process during the DRC appeal, that claim is

barred by the Eleventh Amendment.  The undersigned therefore recommends that Plaintiff's

procedural due process claim against Echessa in his official capacity be DISMISSED without prejudice.[13]

Part of Plaintiff's requested injunctive relief is to "allow inmates to provide input to DRC hearings / decision process." (Doc. No. 45-1, p. 16.) To the extent that this request can be construed as seeking prospective injunctive relief against Echessa in his official capacity, Plaintiff's requested relief is moot. BP-03.91 already requires (as it required in 2018) that inmates be provided with notice and an opportunity to be heard. The policy requires that notice of the denial of correspondence be provided to both inmates and to senders or addressees in the form of Correspondence Denial Forms. (Doc. No. 17-1, p. 10; *see also* Appendix A, p. 11.) The policy then states:

> The offender shall be given a sufficiently detailed opportunity description of the rejected correspondence to permit effective use of the appeal procedures. The offender, sender, or addressee may appeal the mailroom staff's decision through the procedures outlined in this policy. The offender or sender may submit a written argument as to why the item should not be denied for the DRC's consideration.

*Id.* BP-03.91's appeal procedures provide for submission of a "written notice of appeal, including justification," to the DRC for consideration, and that the DRC shall render its decision and issue a written notification of that decision. *Id.* at 14.

The policy thus already specifically provides for notice regarding denials of correspondence and for the opportunity, with specific instructions and timelines, for inmates to appeal denials of correspondence to the DRC – just as it did in 2018, when Plaintiff's mailed items were denied. This notice and opportunity to be heard is the relief that Plaintiff's complaint seeks with regard to due process. *See* Doc. No. 45-1, p. 16 (seeking injunctive relief "to allow

---

[13] For the same reason, to the extent that Plaintiff's claims against the TBCJ Board members and defendants Collier and Lumpkin could be liberally construed as a suit against those defendants in their official capacities for the singular past denial of mail, those claims too are barred and should be DISMISSED without prejudice.

inmates to provide input to DRC hearings / decision process").  Because Plaintiff has already

obtained the relief sought, and because a favorable decision would not entitle Plaintiff to any

additional relief, he no longer has a cognizable legal interest in the outcome of this claim, and so

his complaint is moot in this respect.  *Cf. Stauffer v. Gearhart*, 741 F.3d 574, 581-82 (5th Cir.

2014) (injunctive relief claim mooted by change in policy correcting complained-of deficiencies;

government actors accorded a presumption of good faith in applying new policy); *see also*

*Vazquez v. H.S.I.*, No. 5:21-CV-00164, 2022 WL 773912, at *1 (S.D. Tex. Feb. 25, 2022) (Song

Quiroga, M.J.), *adopted*, 2022 WL 772965 (S.D. Tex. Mar. 14, 2022) ("Federal courts lack

jurisdiction to decide moot cases because their constitutional authority extends only to actual

cases or controversies.").  Any future denial of due process would be in contravention of the

already-existing provisions of BP-03.91.  Plaintiff has not alleged the denial of any of his mailed

items since the single 2018 incident; the undersigned finds that the potential for future denials of

due process despite the provisions of BP-03.91 is too speculative to overcome mootness.

 Even if Plaintiff's complaint could be liberally construed as seeking "notice relief" as a

means of deterring future denials of due process, "deterrence interests are insufficient to

overcome the dictates of the Eleventh Amendment."  *Green v. Mansour*, 474 U.S. 64, 68-71

(1985).  The undersigned therefore recommends that Plaintiff's official capacity claim against

Echessa be DISMISSED under Rule 12(b)(1) as moot.

 The undersigned recognizes that the dismissal motion filed by the Texas Attorney

General's Office requests dismissal pursuant to Rule 12(b)(1) of defendants Collier, Lumpkin,

O'Daniel, Perryman, Burrow, DeAyala, Francis, Johnson, Miles, Nichols, and Siv, but not of

defendant Echessa.  *See* Doc. No. 52, pp. 6-7.  The district court is empowered to "dismiss a

claim on its own motion as long as the procedure employed is fair."  *Carver v. Atwood*, 18 F.4th

494, 498 (5th Cir. 2021) (quoting *Davoodi v. Austin Indep. Sch. Dist.*, 755 F.3d 307, 310 (5th Cir. 2014) (internal quotation omitted)).  Here, the undersigned is issuing a memorandum and recommendation, which all parties will receive.  Prior to any dismissal by the district court, the parties will have the opportunity to object to the recommendation that this claim against defendant Echessa be dismissed.  *Cf. Carver*, 17 F.4th at 498 (citing *Carroll v. Fort James Corp.*, 470 F.3d 1171, 1177 (5th Cir. 2006)).  All parties will have the opportunity to be heard, and the procedure to be employed is fair.

### 6. *Recap of Rule 12(b)(1) motion recommendations.*

The undersigned recommends the following actions regarding the Rule 12(b)(1) dismissal motion:

- Plaintiff's First Amendment claims against the TBCJ Board members and defendants Collier and Lumpkin in their official capacities based on the 2018 denial of Plaintiff's mail should be DISMISSED without prejudice based on Eleventh Amendment immunity, because those defendants do not play any role in the enforcement of BP-03.91;

- Plaintiff's First Amendment claim against defendants Collier and Lumpkin in their official capacities based on the 2018 denial of Plaintiff's mail should be DISMISSED without prejudice based on Eleventh Amendment immunity, because Plaintiff plausibly alleges only a single past denial of mail, not an ongoing violation;

- Plaintiff's First Amendment claim against defendants Collier and Lumpkin in their official capacities based on the alleged unconstitutionality of BP-03.91's restriction against receiving packages containing stationery should be DISMISSED without prejudice, because Plaintiff has failed to plausibly allege that either defendant plays a role in the enforcement of BP-03.91;

- Plaintiff's First Amendment claim against the TBCJ Board member defendants in their official capacities based on the alleged unconstitutionality of BP-03.91's restriction against receiving packages containing stationery should PROCEED, because the board members are tasked with promulgating the policy and because the requested relief is prospective and injunctive in nature; and

- Plaintiff's procedural due process claim against defendant Echessa in his official capacity should be DISMISSED without prejudice, because Plaintiff's claim is based on a single alleged denial of due process, not an ongoing violation, and because Plaintiff has already

received his requested relief in the form of a policy that permits DRC appeals that include notice and an opportunity to be heard.

### D. The Rule 12(b)(6) motion.

The moving defendants also seek dismissal based on Federal Rule of Civil Procedure 12(b)(6), alleging that Plaintiff has failed to state claims upon which relief may be granted. The defendants also seek dismissal based on the doctrine of qualified immunity. For the reasons discussed below, Plaintiff's claims against all defendants in their official capacities should be DISMISSED with prejudice.

#### 1. Dismissal motions under Rule 12(b)(6).

Federal Rule of Civil Procedure 12(b)(6) provides that a party may assert by motion a defense that a plaintiff's complaint "fail[s] to state a claim upon which relief may be granted." Fed. R. Civ. P. 12(b)(6). In evaluating a motion for dismissal under this rule, courts assess whether the complaint contains "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The requirement for facial plausibility is met when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The pleading standard does not require detailed factual allegations, "but does demand more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Hurd v. Barnette*, No. 6:15cv734, 2017 WL 9289643, at *11 (E.D. Tex. Jan. 24, 2017), *adopted*, 2017 WL 892118 (E.D. Tex. Mar. 6, 2017) (citing *Iqbal*, 556 U.S. at 677-78).

A Rule 12(b)(6) motion "tests the sufficiency of the pleadings, not the merits of the case." *George v. SI Group, Inc.*, 36 F.4th 611, 619 (5th Cir. 2022) (citing *Sewell v. Monroe City*

28/52

*Sch. Bd.*, 974 F.3d 577, 582 (5th Cir. 2020)).  For this reason, well-pleaded factual allegations of

a complaint must be taken as true and viewed in the light most favorable to the plaintiff.  *Id.*

Courts may, in evaluating motions filed under Rule 12(b)(6), consider evidence that is

attached to the motion itself, referred to in the complaint, and central to the plaintiff's claim, or

that is subject to judicial notice under Federal Rule of Evidence 201.  *George*, 36 F.4th at 619

(citing *Walker v. Beaumont Indep. Sch. Dist.*, 938 F.3d 724, 735 (5th Cir. 2019)).  If the court

considers evidence beyond the pleadings or these additional matters, the court commits error.  *Id.*

(citing *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir.

2014)).  But even though *pro se* pleadings are viewed under a less stringent standard than those

penned by an attorney, a court "need not credit conclusory allegations, legal conclusions couched

as factual allegations, or unwarranted deductions of fact."  *Trevino v. City of Pleasanton*, No.

5:18-CV-00688-DAE-RBF, 2019 WL 1793360, at *4 (W.D. Tex. Apr. 23, 2019) (internal

quotation marks omitted) (citing *Chhim v. Univ. of Tex. at Austin*, 836 F.3d 467, 469 (5th Cir.

2016)); *see also Iqbal*, 556 U.S. at 678.

### 2. *The First Amendment claim.*

The Court has construed Plaintiff's complaint, as amended, as lodging First Amendment

claims against defendants the TBCJ Board members (O'Daniel, Perryman, Miles, DeAyala,

Francis, Johnson, Siv, Nichols, and Burrow), and against defendants Flores, Echessa, and Smith,

in their individual capacities for monetary relief, based on the 2018 denial of Plaintiff's mailed

items – the blank character sheets and the phone logs.  (Doc. No. 56, p. 5; Doc. No. 47, p. 19.)

The moving defendants seek dismissal under Rule 12(b)(6) because, in their view,

Plaintiff has failed to plausibly allege any constitutional injury from the denial of the mailed

items.  The undersigned recommends that this aspect of the dismissal motion be DENIED.  The

undersigned further recommends that the dismissal motion be DENIED to the extent it seeks a declaration that there are legitimate penological reasons for the policy relied upon to deny Plaintiff's mail.  But the undersigned nevertheless recommends that Plaintiff's claims against the Board member defendants be DISMISSED with prejudice for failure to state a claim upon which relief may be granted: Plaintiff fails to plausibly allege that those defendants had any involvement in the 2018 denial of Plaintiff's mailed items.

### a. Plaintiff has sufficiently alleged an "injury in fact" based on the First Amendment.

The moving defendants contend that Plaintiff has failed to allege a viable First Amendment claim related to the 2018 denial of his mail.  According to the defendants, Plaintiff lacks standing to bring his claim because he has failed to allege an "injury in fact."  (Doc. No. 52, pp. 14-16.)  At this stage of the proceedings, the undersigned cannot agree, and recommends that this aspect of the Rule 12(b)(6) motion be DENIED.

The First Amendment to the United States Constitution provides in pertinent part that Congress "shall make no law . . . abridging the freedom of speech . . . ."  U.S. Const. amend. I.  The First Amendment has been made applicable to the States through the Fourteenth Amendment.  U.S. Const. amend. XIV.  A prisoner retains those First Amendment rights that are not inconsistent with his or her status as a prisoner or with the legitimate penological interests of the corrections system.  *Pell v. Procunier*, 417 U.S. 817, 822 (1974).  An abridgement of the right of free speech occurs when government engages in unjustified interference with communication.  *See Brewer v. Wilkinson*, 3 F.3d 816, 820 (5th Cir. 1993).  And as the Fifth Circuit previously stated in this case, inmates retain a First Amendment right to be free from mail censorship that is not "'reasonably related to legitimate penological interests.'"  *Schwarzer*,

2021 WL 6060002, at *1 (quoting *Turner*, 482 U.S. at 89); *see Thornburgh v. Abbott*, 490 U.S. 401, 409 (1989).

Plaintiff's claim, as liberally construed, is that his First Amendment right to free speech was violated when mailroom staff and the DRC denied him the items mailed by his motion. The question presented, then, is whether Plaintiff has plausibly alleged that that denial caused an "invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). He must also show a causal connection between the injury and the complained-of conduct, and that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision. *Id.* at 560-61.

The moving defendants posit that Plaintiff lacks standing to bring his claims because he fails to plausibly allege that he suffered an injury in fact – that is, that the denial of the blank character sheets and blank phone logs from Plaintiff's incoming mail abridged his free speech rights. (Doc. No. 52, pp. 15-16.) They argue that Plaintiff, by his own acknowledgement, can "purchase paper to create the game sheets and phone logs from the Unit." *Id.* at 16. The moving defendants brush aside Plaintiff's allegations as mere lamentations "that game sheets and phone logs are not stationery and that the quality of paper available to him is not up to his standards." *Id.* at 15.

The sole free speech impingement claimed by Plaintiff is the denial of incoming blank forms. Plaintiff does not allege that he is restricted from creating character sheets, or from creating characters using those sheets. Likewise, he does not allege that he is restricted from creating phone logs, or from logging phone calls. Indeed, Plaintiff acknowledged in an earlier filing in this case that he simply began creating his own phone logs after the incoming mail was

31/52

denied.  *See* Doc. No. 11, p. 3 (asked whether he could create a similar log by himself using a

blank piece of paper and including relevant rows and columns, Plaintiff responded "I can and I

have been doing so for the past year.").  Likewise, when asked whether he was claiming that he

could not create character sheets himself by using a blank piece of paper and including relevant

rows and columns, Plaintiff replied:

> That is not my claim because I have created the forms manually.  The problem is
> two fold.  First is the amount of sheets I manage to mangle in using them.  Forcing
> me to create more and more.  The other is with the complications of the game and
> my penchant for perfection.  If I had pre-made forms, I could design characters to
> my heart's content.  Instead, I have to be careful and limit my imagination to the
> limited pages I generate by hand.

*Id.* at 4.

Plaintiff also does not allege that he is unable to make any particular expression of speech

because of the denial of the blank character sheets or phone logs.  He does not allege that his

non-receipt of the blank character sheets or blank phone logs has prevented him, or is preventing

him, from saying anything, making any statement, or expressing himself in any way, or that he is

in any way unable to communicate with others or to express himself.  Plaintiff also does not

contend that he intends to send to or share with anyone else the character sheets or phone logs.

Instead, his pleadings indicate that he intends the items to be strictly for his own personal use,

not for interpersonal communication or for any form of expression.  Plaintiff has stated that his

purpose for the phone logs is to "track my phone calls since the company fails to provide

statements."  (Doc. No. 11, p. 2.)  Additionally, he described his intended use of the blank

character sheets:

> World of Warcraft is a computer game I joined a year prior to my incarceration.
> Confident in my exoneration, I began to read strategy guides to improve my game
> once I am out.  With the sheets, I had hoped to determine which characters to create
> at that time.

32/52

*Id.* at 3.  Asked whether he was claiming that he could not create a similar form by himself using

a blank piece of paper and including relevant rows and columns, Plaintiff replied:

> That is not my claim because I have created the forms manually.  The problem is two fold.  First is the amount of sheets I manage to mangle in using them.  Forcing me to create more and more.  The other is with the complications of the game and my penchant for perfection.  If I had pre-made forms, I could design characters to my heart's content.  Instead, I have to be careful and limit my imagination to the limited pages I generate by hand.

*Id.* at 4.

But even despite all this, Plaintiff's complaint contains an allegation that his incoming

mail was denied based on its "content."  The Correspondence Denial Form given to Plaintiff is

the one prescribed by BP-03.91 and says that the blank character sheets and blank phone logs

were denied because of their content.  (Doc. No. 1-5, p. 2.)  BP-03.91 directs content-based

denial of mail, whether incoming or outgoing, based on specific criteria.  (Doc. No. 17-1, pp. 9-

10.)  Construing Plaintiff's complaint liberally, it is this content-based denial of incoming mail,

itself, that constitutes the alleged injury in fact – an allegedly unjustified government-conducted

interference with communication.  *See Brewer*, 3 F.3d at 820.  Although Plaintiff can create –

and has been creating – his own character sheets and phone logs, the content-based denial of the

incoming mailed version of those character sheets and phone logs is sufficient to allege an injury

in fact.

The moving defendants also argue that the denial of the mailed items, whether arbitrary

or not, "does not rise to the level of a constitutional violation."  (Doc. No. 52, p. 15.)  The fact

that Plaintiff has been able to create the same character sheets and phone logs himself – even

though they might not be of identical quality – could suggest that the quantum of injury to

Plaintiff's First Amendment rights is low, or negligible.  The Supreme Court has stated that there

33/52

is a "de minimis level of imposition with which the Constitution is not concerned." *Ingraham v. Wright*, 430 U.S. 651, 674 (1977); *see also Arnett v. Myers*, 281 F.3d 552, 560 (6th Cir. 2002) (in a case alleging First Amendment retaliation: "It is not the case that every action, no matter how small, is constitutionally cognizable."). *Ingraham* has been applied by at least one federal court to analyze and reject a constitutional claim on the ground that it failed to demonstrate an actual injury. *See Publicola v. Lomenzo*, No. 1:21-CV-1303, 2022 WL 1027099, at *13 (N.D.N.Y. Apr. 5, 2022) (First Amendment claim dismissed because it "did not allege any concrete harm of a constitutional dimension") (internal quotation marks omitted).

But *Ingraham*, in describing *de minimis* imposition, was discussing whether an imposition on a constitutional right was so minimal as not to trigger due process protections, not whether the alleged constitutional violation was important enough to state an injury in fact. *See* 430 U.S. at 674; *see also Corral v. Bouldin*, No. 2:18-cv-01629 CKD P, 2019 WL 5887183, at *2 (E.D. Cal. Nov. 12, 2019) (citing *Peyton v. Cnty. of Ventura*, No. CV 17-3202 VAP (AJW), 2017 WL 6816355, at * 3 (C.D. Cal. Aug. 22, 2017) (short-term deprivations to prisoners were so *de minimis* that they did not qualify as punishment, and thus did not trigger due process protections).

Here, the undersigned is evaluating a motion to dismiss for failure to state a claim, a motion which assesses whether Plaintiff's lawsuit may proceed. The factual record has not been developed, and the undersigned believes it inappropriate to attempt to assign a degree of importance to the alleged constitutional injury as a matter of law. The undersigned therefore recommends denial of the Rule 12(b)(6) motion to the extent that it contends that Plaintiff has failed to allege an injury in fact.

34/52

### b.  A declaration that the denial of Plaintiff's mail was reasonably related to legitimate penological interests is premature.

Because Plaintiff has sufficiently alleged an injury in fact, the question for resolution is whether the claimed abridgment of his First Amendment rights was "'reasonably related to legitimate penological interests.'"  *Schwarzer*, 2021 WL 6060002, at *1 (quoting *Turner*, 482 U.S. at 89).  The moving defendants advance, through argument of counsel, a proffered "legitimate penological interest," seeking a ruling pursuant to *Turner* that the policy is constitutional and thus that Plaintiff's claim is subject to dismissal under Rule 12(b)(6).  *See* Doc. No. 52, pp. 8-10.  Counsel asserts that the legitimate penological interest is "protecting prison security.  Allowing mail that encourages inmates to engage in behavior that highlights division by weapons, armor, race, and class certainly impacts prison security."  *Id.* at 9.  Hence, the argument goes, Plaintiff cannot prevail on his First Amendment claim because he suffered no constitutional injury.

Argument of counsel is not evidence, however, *see Chester v. Assocs. Corp. of N. Am.*, No. 3:97-CV-3186-L, 2000 WL 743679, at *3 (N.D. Tex. May 26, 2000), and the undersigned is reluctant to accept a counsel-proffered rationale, unsupported by evidence or established case law, as the basis for dismissal of Plaintiff's case.  And in any event, because *Turner*'s balancing test is fact-intensive, it is ill-suited for resolution in a Rule 12(b)(6) motion.  *Cf. McKenzie v. O'Gara*, 289 F. Supp. 2d 389, 391-92 (S.D.N.Y. 2003) (denying defendants' *Turner*-based motion to dismiss complaint, finding that defendants "may well be correct, but their argument is more appropriately made in the context of a motion for summary judgment . . . rather than in a motion addressed to the face of the pleadings"); *accord Dunn v. Castro*, 621 F.3d 1196, 1205 n.7 (9th Cir. 2010) (application of *Turner* factors at Rule 12(b)(6) stage is premature because there is

an absence of adequate factual findings).  Moreover, no clear Supreme Court or Fifth Circuit

opinion has already decided the issues presented in this case.  The undersigned therefore cannot

endorse this proffered additional ground for dismissal at this time and recommends that the Rule

12(b)(6) motion be DENIED to the extent it argues that the policy is constitutional.

> ### c.  Plaintiff's individual capacity claims against the TBCJ Board members should be dismissed with prejudice.

The TBCJ Board member defendants (that is, defendants O'Daniel, Perryman, Burrow,

DeAyala, Francis, Johnson, Miles, Nichols, and Siv) seek dismissal of Plaintiff's First

Amendment claim against them in their individual capacities, arguing that they had no personal

involvement in any specific deprivation of mail.  (Doc. No. 52, pp. 11-13.)  Plaintiff, for his part,

responds that these defendants implemented BP-03.91, and so all may be found liable for their

acts or omissions.  (Doc. No. 55, p. 6.)[14]

Section 1983 of Title 42, United States Code, provides a vehicle for redressing the

violation of federal law by those acting under color of state law.  *Nelson v. Campbell*, 541 U.S.

637, 643 (2004).  To prevail on a § 1983 claim, a plaintiff must prove that a person acting under

the color of state law deprived him or her of a right secured by the Constitution or laws of the

United States.  42 U.S.C. § 1983; *West v. Atkins,* 487 U.S. 42, 48 (1988).  A defendant acts under

color of state law if he or she misuses or abuses official power and if there is a nexus between the

victim, the improper conduct, and the defendant's performance of official duties.  *Townsend v.*

*Moya,* 291 F.3d 859, 861 (5th Cir. 2002).

---

[14]  Defendant Echessa, who leads the Director's Review Committee, and defendant Flores, the mailroom supervisor, do not seek dismissal on this ground.  Additionally, although defendants Collier and Lumpkin urge dismissal of the First Amendment individual capacity claims against them, *see* Doc. No. 52, pp. 13-14, the Court has already dismissed those claims.  *See* Doc. No. 47, p. 15; Doc. No. 56, p. 5.

"Personal involvement is an essential element of a civil rights cause of action."
*Thompson v. Steele,* 709 F.2d 381, 382 (5th Cir. 1983). There is no vicarious or *respondeat superior* liability of supervisors under section 1983. *Thompkins v. Belt,* 828 F.2d 298, 303-04 (5th Cir. 1987); *see also Carnaby v. City of Houston,* 636 F.3d 183, 189 (5th Cir. 2011) (the acts of subordinates do not trigger individual § 1983 liability for supervisory officials). A supervisory official may be held liable only if "(1) he affirmatively participates in the acts that cause the constitutional deprivation, or (2) he implements unconstitutional policies that causally result in the constitutional injury." *Porter v. Epps,* 659 F.3d 440, 446 (5th Cir. 2011). But even in the latter situation, the supervisory official must have personally and affirmatively participated in the implementation of the policy, because "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 677; *see also Craaybeek v. Lozada*, No. 7:20-cv-032-O, 2022 WL 4533726, at *2 (N.D. Tex. Aug. 31, 2022) (dismissing § 1983 claim because supervisor official neither actively participated in deprivation of any constitutional right nor affirmatively adopted policies that were wrongful or illegal and which caused the alleged constitutional deprivation).

Here, Plaintiff does not allege that any of the Board member defendants participated personally in the decision to deny him the character sheets and phone logs. Nor does the record independently indicate that they had any such personal role. Individual capacity liability of any Board member defendant can lie, then, only if that Board member affirmatively participated in implementing an unconstitutional policy that causally resulted in a constitutional injury to Plaintiff.

This, Plaintiff cannot demonstrate. Plaintiff offers no allegation that any of the defendant Board members participated affirmatively in implementing BP-03.91 before it was applied to

37/52

Plaintiff in 2018.  The version of the policy in effect at the time of the denial of Plaintiff's mail

(revision 3) was issued on August 23, 2013.  (Doc. No. 17-1, p. 1.)  None of the Board members

had yet been appointed to the Board on that date: the longest-serving Board member, defendant

Miles, was appointed in August 2014, and the other Board members were all appointed thereafter

on dates between August 2015 (defendant Perryman) and May 2020 (defendant Burrow).[15]  The

policy was not revised again until February 25, 2020, long after the 2018 denial of Plaintiff's

mail.  *See* Appendix A, p. 1 (2021 version of policy, revision 5, reflects the date of the version it

superseded – revision 4 – which is February 25, 2020).  Because none of the Board member

defendants took any affirmative action to implement (or re-promulgate) the policy that resulted

in the denial of Plaintiff's mail, those defendants cannot be held liable in their individual

capacities under § 1983 for any deprivation of Plaintiff's constitutional rights stemming from

that denial.  The undersigned therefore recommends that the Board member defendants' Rule

12(b)(6) motion be GRANTED with regard to Plaintiff's First Amendment claim against them in

their individual capacities, and that Plaintiff's claims against the Board members be

DISMISSED with prejudice.

### 3.  *The procedural due process claim.*

The Court has liberally construed Plaintiff's complaint as lodging a procedural due

process claim against defendants Echessa and Smith in their individual capacities for monetary

relief, and against defendant Echessa in his official capacity for declaratory and injunctive relief.

(Doc. No. 47, p. 20 (magistrate judge recommendation); Doc. No. 56, pp. 5-6 (district court

---

[15]  *See* Texas Board of Criminal Justice, *Board Members*, https://www.tdcj.texas.gov/tbcj/brd_members.html (last visited Jan. 9, 2023).  The Court takes judicial notice of this information, because it is contained on a website maintained by the Board and is thus a fact that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  *See* Fed. R. Evid. 201(b)(2); *George*, 36 F.4th at 619.

adoption of recommendation).)  Plaintiff's complaint, liberally construed, alleges that these defendants' upholding of the denial of the mailed items resulted in two different wrongs.  First, Plaintiff alleges that defendants Echessa and Smith violated BP-03.91 by arbitrarily denying the mailed items even though the policy allegedly did not forbid Plaintiff's receipt of those items. Second, Plaintiff alleges that he was denied the opportunity to participate in the DRC appeal process that resulted in these defendants' upholding of the denial of the mailed items.  Defendant Echessa seeks dismissal under Rule 12(b)(6).  (Doc. No. 52, pp. 15-17.)

Plaintiff's first due process claim (arbitrary denial of the mailed items) should be dismissed with prejudice.  The Supreme Court has held that a prison official's intentional deprivation of a prisoner's personal property does not constitute a due process violation if there exists an adequate state post-deprivation remedy.  *See Zinermon v. Burch*, 494 U.S. 113, 115 (1990).  Thus, when a state employee's random, unauthorized conduct, whether intentional or merely negligent, deprives a plaintiff of a constitutionally protected property interest, no § 1983 procedural due process claim is available unless there is no adequate state post-deprivation remedy.  *See Allen v. Thomas*, 388 F.3d 147, 149 (5th Cir. 2004); *Parratt v. Taylor*, 451 U.S. 527, 535-55 (1981) *overruled in part on other grounds*, *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986); *Hudson v. Palmer*, 468 U.S. 517 (1984) (the "*Parratt/Hudson* doctrine").  "Texas law provides an adequate post-deprivation remedy for property loss occasioned by prison employees through the administrative grievance process and through the court system." *Dye v. Ambriz*, 168 F. App'x 638, 639 (5th Cir. 2006).  Among those potential remedies is a Texas state civil action for the tort of conversion.  *See Murphy v. Collins*, 26 F.3d 541, 543-44 (5th Cir. 1994).  Texas also has a statutorily established administrative process for inmate claims relating to wrongful deprivation of property.  *See* Tex. Gov't Code § 501.007.  Here, all of those avenues were

available to Plaintiff to contest the denial of the mailed items.  Plaintiff availed himself of the grievance process, unsuccessfully, and the Fifth Circuit has already upheld the district court's dismissal of his federal claim regarding that grievance.  *See Schwarzer*, 2021 WL 6060002, at *1.  Plaintiff's claim that Echessa and Smith wrongly deprived Plaintiff of his property in violation of BP-03.91 should therefore be DISMISSED with prejudice, because an adequate state post-deprivation remedy was available and because the dismissal of that claim has already been upheld by the Fifth Circuit.[16]

The existence of a post-deprivation remedy does not resolve the second claim, however.  "Conduct is not 'random and unauthorized' for purposes of the *Parratt/Hudson* doctrine if the state 'delegated to [the defendants] the power and authority to effect the very deprivation complained of.'"  *Schwarzer v. Wainwright*, 810 F. App'x 358, 359 (5th Cir. 2020) (bracketed text in original) (quoting *Zinermon*, 494 U.S. at 138).  Plaintiff's second claim, as construed, is that the mailed items were not denied because of random, unauthorized conduct, but instead because he was prevented from being heard during the DRC appeals process, which is conducted pursuant to an established state procedure, BP-03.91.  In this situation, then, the *Parratt/Hudson* doctrine does not apply.  *See Allen v. Thomas*, 388 F.3d 147, 149 (5th Cir. 2004); *see also Augustine v. Doe*, 740 F.2d 322, 329 (5th Cir. 1984).

---

[16]  As with the qualified immunity analysis discussed later in this memorandum, the undersigned recognizes that defendant Smith has not been served or entered an appearance in this litigation.  The undersigned nevertheless concludes that it is appropriate to recommend dismissal of Plaintiff's claims against Smith as well as Echessa based on the existence of an adequate state post-deprivation remedy.  "The Fifth Circuit has recognized that, when one defending party establishes that the plaintiff has no cause of action, this defense generally inures also to the benefit of other similarly situated defendants."  *Taylor v. Collier*, No. H-21-2161, 2022 WL 2871819, at *4 n.2 (S.D. Tex. July 21, 2022) (Rosenthal, C.J.) (citing *Lewis v. Lynn*, 236 F.3d 766, 768 (5th Cir. 2001)).  "The policy rationale for this rule is that it would be incongruous and unfair to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants."  *Lewis*, 236 F.3d at 768 (internal quotation marks omitted).  Plaintiff's claim here alleges similar conduct by Echessa and Smith.  Echessa and Smith are similarly situated, and Plaintiff does not plausibly contend otherwise.  Accordingly, the dismissal argument raised by Echessa applies and inures equally to Smith.  All parties will have an opportunity to be heard regarding the inclusion of defendant Smith in the undersigned's dismissal recommendation.  *See Carver*, 18 F.4th at 498.

But Plaintiff's second claim should be dismissed anyway, because Plaintiff has failed to allege any facts indicating that he was in fact prevented from participating in the DRC appeal process.  The Fifth Circuit has held in this case that "[t]raditional procedural due process arguably requires a right to object and a right to participate in DRC's consideration of the appeal, even informally or through written submissions."  *Schwarzer*, 2021 WL 6060002, at *2 (internal quotation marks omitted).  Plaintiff insists that "it is nonsense to claim Schwarzer had an opportunity to be heard because he had checked a box [on the Correspondence Denial Form, to signal that he wanted a DRC review]."  (Doc. No. 55, p. 7.)  He continues: "At the very least, there should be an option to explain the purpose he contends [sic] the denial.  If Schwarzer could have engaged with the DRC, it is likely his denials would have been reversed."  *Id*.  But as Plaintiff's submitted documents plainly indicate, BP-03.91 specifically allows for inmates to provide written input to the DRC in challenging the denial of correspondence.  (Doc. No. 17-1, pp. 13-14.)[17]  Plaintiff does not acknowledge the policy's input provisions, and he makes no allegation that anyone actually prevented him from submitting input to the DRC in support of his position.  Because Plaintiff has failed to allege any facts suggesting that that he was denied the opportunity to be heard regarding the denial of the mailed items, and because BP-03.91 plainly allowed for Plaintiff to be noticed and heard, Plaintiff's procedural due process claim should be DISMISSED with prejudice under Rule 12(b)(6).

### 4. The individual capacity claims against all defendants should be dismissed with prejudice because the defendants enjoy qualified immunity.

Qualified immunity shields officials performing discretionary functions from "liability for civil damages insofar as their conduct does not violate clearly established . . . constitutional

---

[17] The policy continues to allow for such participation during the DRC appellate process.  (Appendix A, pp. 14-15.)

rights of which a reasonable person would have known." *Buehler v. Dear*, 27 F.4th 969, 981

(5th Cir. 2022) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  For the reasons

discussed below, all of Plaintiff's claims against all defendants in their individual capacities

should be DISMISSED with prejudice based on the qualified immunity doctrine.

Plaintiff has lodged two individual capacity constitutional claims: the violation of his

First Amendment right to free speech and the violation of his procedural due process rights by

prison officials.  Defendants seek dismissal of those claims, arguing that Plaintiff has failed to

allege a violation of a "clearly established" constitutional right.  (Doc. No 52, p. 20.)

### a.  *Legal standard.*

The basis for the qualified immunity doctrine is "the idea that officials who perform their

duties reasonably should not fear the harassment, distraction, and liability of a civil lawsuit for

simply doing their job, while those who exercise their power irresponsibly should be held

accountable." *Broussard v. Jefferson Cnty.*, No. 1:15-CV-00309, 2016 WL 11190107, at *3

(E.D. Tex. Apr. 20, 2016), *adopted*, 2016 WL 3063826 (E.D. Tex. May 31, 2016) (citing

*Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Qualified immunity is a generous shield: it

provides "ample protection to all but the plainly incompetent or those who knowingly violate the

law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  The doctrine "gives government officials

breathing room to make reasonable but mistaken judgments about open legal questions."

*Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).  Thus, a government official can be held

personally liable for monetary damages only if the official's particular conduct "violated a

statutory or constitutional right" and "the right was 'clearly established' at the time of the

challenged conduct." *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *al-Kidd*, 563 U.S. at

735).  Courts have "discretion to decide which of the two prongs of qualified-immunity analysis to tackle first."  *al-Kidd*, 563 U.S. at 735 (citing *Pearson*, 555 U.S. at 236).

A government official's conduct violates clearly established law when, at the time of the challenged conduct, "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *al-Kidd*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (cleaned up).  A binding court case directly on point is not required, but "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*; *see also Malley*, 475 U.S. at 341.  "Abstract or general statements of legal principle untethered to analogous or near-analogous facts are not sufficient to establish a right 'clearly' in a given context; rather the inquiry must focus on whether a right is clearly established as to the specific facts of the case."  *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citing *Brousseau v. Haugen*, 543 U.S. 194, 198 (2004).  Absent controlling authority, there must be a "robust 'consensus of cases of persuasive authority.'"  *al-Kidd*, 563 U.S. at 741 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)).  And the controlling decision or consensus must be with regard to the official's "*particular* conduct," described with specificity.  *Harmon v. City of Arlington, Tex.*, 16 F.4th 1159, 1166 (5th Cir. 2021) (citing *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (*per curiam*) (emphasis in original)).  The inquiry is judged against the backdrop of the law at the time of the conduct.  *Morgan v. Chapman*, No. 6:17-CV-00004, 2022 WL 4367057, at *8 (S.D. Tex. Sept. 20, 2022) (Tipton, J.) (citing *Kisela v. Hughes*, __ U.S. __, 138 S. Ct. 1148, 1152 (2018) (*per curiam*)).

Importantly, when qualified immunity is asserted, the burden shifts to the plaintiff to demonstrate that the doctrine does not apply.  *Club Retro, LLC, v. Hilton*, 568 F.3d 181, 194 (5th Cir. 2009); *McClendon v. City of Columbia, Miss.*, 341 F.3d 314, 323 (5th Cir. 2002) (*en banc*).

43/52

Thus, to negate qualified immunity at the Rule 12(b)(6) stage, Plaintiff must plead sufficient facts to plausibly show that the defendants' particular conduct violated a constitutional right that was clearly established at the time of the alleged misconduct. *Harmon*, 16 F.4th at 1163.

Thus, the relevant qualified immunity questions regarding Plaintiff's liberally construed claims are:

- (Regarding Plaintiff's First Amendment "denial of mail" claim) Has Plaintiff alleged facts to plausibly show that the denial of the blank character sheets and blank phone logs – whether because of their content or because they constituted "stationery" – violated a clearly established constitutional right of Plaintiff that existed in 2018?

- (Regarding Plaintiff's First Amendment claim about the TBCJ Board members' promulgation of BP-03.91) Has Plaintiff alleged facts to plausibly show that the promulgation of BP-03.91's provisions regarding denial of mail based on content or because it constitutes "stationery" violated a clearly established constitutional right of Plaintiff that existed in 2018?

- (Regarding Plaintiff's procedural due process claim) Has Plaintiff alleged facts to plausibly show that defendants Echessa and Smith, by applying BP-03.91 to deny Plaintiff's mailed items, violated a clearly established procedural due process right that existed in 2018?

The undersigned concludes that the answer to all three questions is "no," and that qualified immunity therefore shields all of the defendants in this case.

### b. The First Amendment claims.

Plaintiff's First Amendment claims are based on his liberally construed allegation that denial of the blank character sheets and phone logs violated his right to free speech. The rationale provided to Plaintiff by unit mailroom staff and the DRC was that the items were denied because of their "content." (Doc. No. 1-5 (Correspondence Denial Form).) Plaintiff also alleges he was told that the items may have been denied to him because they constituted "stationery" or because "gaming" was not allowed in TDCJ. (Doc. No. 11, p. 3) Either way, Plaintiff fails to allege facts sufficient to overcome the presumption of qualified immunity. To

44/52

overcome the presumption of qualified immunity, Plaintiff would have to demonstrate that all reasonable prison officials in 2018 would have known that it was improper under the First Amendment to deny the blank character sheets and phone logs.  *See al-Kidd*, 563 U.S. at 741. Plaintiff fails to make this showing.

In 2018, when the denial of Plaintiff's mail occurred, BP-03.91 specifically provided for denials of correspondence based on content.  Such denials, then and now, are governed by the analysis framework in *Turner v. Safley*, which permits prison regulations or practices that directly affect a prisoner's constitutional rights, including First Amendment rights, so long as those regulations or practices are "reasonably related to a legitimate penological interest."  482 U.S. at 89; *see also Prison Legal News v. Livingston*, 683 F.3d 201, 215 (5th Cir. 2012); *Brewer*, 3 F.3d at 823-24.  *Prison Legal News*, decided in 2012, provided a detailed analysis and review of TDCJ's decision, based on BP-03.91, to deny several mailed publications to inmates based on those publications' content.  The court, analyzing and applying the *Turner* factors, upheld the denials against a First Amendment challenge.  *See Prison Legal News*, 683 F.3d at 215-21.  A reasonable prison official in 2018, with the benefit of *Prison Legal News* and *Thornburgh*, and in the absence of any consensus of authority that denying incoming mailed items under BP-03.91 for content purposes was unconstitutional, would have no reason to believe that applying BP-03.91 to screen incoming prisoner mail was clearly improper.

To survive a qualified immunity-based dismissal under Rule 12(b)(6), Plaintiff would have to plead facts showing that every reasonable prison official in 2018 would have known that it was improper to deny blank character sheets and blank phone logs because of their content. Plaintiff does not plead any such fact.  At most, he claims that Flores' denial, and the DRC's upholding of that denial, was simply violative of the First Amendment.  Even if Plaintiff were

45/52

correct in this allegation, this would not be enough to defeat qualified immunity, because Plaintiff must plead facts showing that it was obvious to all reasonable prison officials in 2018 that denying blank character sheets and blank phone logs would violate the First Amendment. Plaintiff has failed to plausibly allege any such fact, so the undersigned recommends that the First Amendment claims against defendants Flores (from the mailroom) and Echessa and Smith (from the DRC) be DISMISSED with prejudice based on qualified immunity.

Likewise, with regard to Plaintiff's claim that the mailed items were denied because they constitute "stationery," qualified immunity is also appropriate.  The undersigned has identified no pre-2018 Supreme Court or Fifth Circuit opinion finding that denial of packages containing stationery supplies is unconstitutional.  Indeed, an unpublished Fifth Circuit opinion issued in 2000 upheld, based on *Thornburgh*, a prison's prohibition on inmates' receipt of envelopes and greeting cards on the grounds that they could be used to smuggle drugs or other contraband to inmates.  *Leachman v. Thomas*, 289 F.3d 1148 (table), 2000 WL 1239126, at *1 & n.2, *4 (5th Cir. Aug. 9, 2000).  All of the other cases the undersigned has identified on this subject upheld policies denying receipt of stationery supplies on the ground that drugs or other items could be smuggled in with the stationery or could trigger arguments among inmates.  *E.g.*, *Gonzalez v. Josephson*, No. 14-cv-4366, 2019 WL 1013737, at *22-23 (N.D. Ill. Mar. 4, 2019) (stationery); *Sadler v. Lantz*, No. 3-07-cv-1316, 2011 WL 4561189, at *4, *7 (D. Conn. Sept. 30, 2011) (greeting cards); *Muhammad v. United States*, No. 07-cv-01808-BNB, 2008 WL 1758854, at *4 (D. Colo. Apr. 9, 2008) ("the Court knows of no constitutional right to receive stationery materials from sources outside of the prison").  The undersigned concludes that a reasonable jail official in 2018 would have had no reason to believe that denial of incoming mail because it constitutes "stationery" is improper under the First Amendment.  To escape Rule 12(b)(6)

46/52

dismissal based on qualified immunity, Plaintiff would have to plead facts to show that every reasonable prison official in 2018 would have known that denying incoming mail because it contained stationery items was improper because it would violate the First Amendment. Plaintiff fails to make any such factual claim, and the undersigned therefore concludes that defendants Flores, Echessa, and Smith are entitled to qualified immunity. Accordingly, the undersigned recommends that Plaintiff's First Amendment claims against them be DISMISSED with prejudice.

Finally, to the extent that Plaintiff's claim can be liberally construed to allege that the mailed items were denied because "gaming" was not permitted in TDCJ, dismissal based on qualified immunity is also appropriate. To defeat dismissal, Plaintiff would have to allege facts showing that every reasonable prison official in 2018 would have known that it was improper to ban "gaming" in TDCJ and thus to deny incoming mailed items on that basis. Plaintiff has made no such factual allegation, and the undersigned has found no authority, much less a robust consensus of authority, indicating that prohibiting gaming (and denying mailed items based on such a prohibition) violates the First Amendment. Thus, the undersigned recommends that Plaintiff's First Amendment claims against defendants Flores, Echessa, and Smith be DISMISSED with prejudice on this ground as well, based on qualified immunity.

### c. *The provisions of BP-03.91.*

The Court has retained a First Amendment claim against the TBCJ board members in their individual capacities. That claim too should be dismissed based on qualified immunity. As discussed previously, the board members had no personal involvement in the actual denial of Plaintiff's mailed items. Additionally, none of the members were part of the Board when BP-03.91 was promulgated prior to the 2018 denial of the mailed items. The undersigned has

already recommended dismissal of the claims against the Board members on these grounds. It is therefore unnecessary for the district court to consider whether the TBCJ Board members are entitled to qualified immunity. In an abundance of caution, however, the undersigned addresses that issue here.

The Board members are also entitled to qualified immunity. To survive dismissal under Rule 12(b)(6), Plaintiff would have to allege facts showing that every reasonable Board member would have known in 2018 that promulgating a policy banning incoming mail based on its content, constituting stationery, or facilitating gaming violated the First Amendment. The Board member defendants, themselves, did not take any action at all to promulgate BP-03.91, but even if they had, as discussed above, no existing authority in 2018 clearly established that promulgation of the policy violated the First Amendment. The Board members could not reasonably have known that it was clearly improper to promulgate content-based restrictions on incoming correspondence, incoming packages containing stationery, or incoming packages facilitating gaming, so long as those restrictions were reasonably related to legitimate penological interests – and it was not clearly established in 2018 that such restrictions were not reasonably related as required. The Board members are therefore entitled to qualified immunity, and Plaintiff's individual capacity claims against them should be DISMISSED with prejudice.

### d. The procedural due process claim.

Finally, the qualified immunity doctrine applies to the application of BP-03.91's appeal procedure in this case. In 2018, when the DRC upheld the denial of Plaintiff's incoming mailed items, no judicial opinion found by the undersigned had held that an inmate correspondence policy that provided for appeal of a denial, including notice to the inmate and an opportunity for the inmate to submit written matters in support of the appeal, was constitutionally deficient. To

48/52

survive Rule 12(b)(6) dismissal based on qualified immunity, Plaintiff would have to allege facts showing that every reasonable DRC member would have known that BP-03.91's appeal procedure was constitutionally deficient.  Plaintiff makes no such allegation.  Indeed, he makes no factual allegation that anyone – not defendants Echessa or Smith, or anyone else – prevented him from submitting written matters in support of his DRC appeal of the denied mail items pursuant to BP-03.91's plainly written procedures.  Nor does Plaintiff allege that anyone misled him regarding the DRC appellate procedure; in fact, he submitted a copy of that procedure as part of this litigation.  (Doc. No. 17-1.)  Because Plaintiff fails to overcome the presumption of qualified immunity, his procedural due process claims against defendants Echessa and Smith in their individual capacities should be DISMISSED with prejudice.

The undersigned again recognizes that defendant Smith has not been served or entered an appearance in this litigation.  The undersigned nevertheless concludes that it is appropriate to recommend dismissal of Plaintiff's claims against Smith based on qualified immunity.  In the context of qualified immunity, Plaintiff's claims allege similar conduct by Echessa and Smith in their individual capacities: denial of Plaintiff's procedural due process rights.  "The Fifth Circuit has recognized that, when one defending party establishes that the plaintiff has no cause of action, this defense generally inures also to the benefit of other similarly situated defendants." *Taylor*, 2022 WL 2871819, at *4 n.2 (citing *Lewis*, 236 F.3d at 768).  "The policy rationale for this rule is that it would be incongruous and unfair to allow some defendants to prevail, while not providing the same benefit to similarly situated defendants."  *Lewis*, 236 F.3d at 768 (internal quotation marks omitted).  This rule has been applied to dismiss claims based on qualified immunity, even where the defendant has not appeared in the case.  *E.g.*, *Jones v. Lamar Cnty.*, No. 4:21-CV-00156, 2022 WL 17175071, at *25 (E.D. Tex. Sept. 9, 2022), *adopted*, 2022 WL

49/52

17170943 (E.D. Tex. Nov. 22, 2022); *Lexing v. Edwards*, No. 17-1092, 2018 WL 2350650, at

*15 (W.D. La. Apr. 30, 2018), *adopted*, 2018 WL 2347093 (W.D. La. May 23, 2018); *Ahmadi v.

Pool*, No. H-15-0302, 2017 WL 2829694, at *7-8 (June 28, 2017) (Gilmore, J.); *Hilmers v.

Khoshdel*, No. H-13-3795, 2015 WL 5517152, at *11, *12 (S.D. Tex. Sept. 15, 2015)

(Rosenthal, J.).

Here, defendants Echessa and Smith are similarly situated, and Plaintiff does not

plausibly contend otherwise.[18]  Thus, the qualified immunity defense urged by defendant

Echessa applies equally to defendant Smith: even if Smith were to have appeared in this case, the

same qualified immunity defense inures to her.[19]  Dismissal of both defendants based on

qualified immunity is therefore appropriate.

### *5. Recap of Rule 12(b)(6) motion recommendations.*

The undersigned recommends the following actions, regarding the Rule 12(b)(6)

dismissal motion:

- Plaintiff's First Amendment claims against the TBCJ Board members in their individual capacities should be DISMISSED with prejudice, because Plaintiff fails to plausibly allege that any of the Board member defendants had any personal involvement in the 2018 denial of Plaintiff's mail or that any of the Board member defendants personally participated in the promulgation of BP-03.91;

- Plaintiff's First Amendment claims against defendants Collier and Lumpkin in their individual capacities should be DISMISSED with prejudice, because Plaintiff fails to plausibly allege that either defendant had any personal involvement in the promulgation of BP-03.91;

---

[18]  In addition to her role on the DRC, Plaintiff alleges that defendant Smith labored under a conflict of interest when she acted on his Step 2 grievance.  (Doc. No. 45-1, p. 11.)  But the district court has already dismissed this same complaint – that Smith violated his due process rights by improperly denying his Step 2 grievance in reliance of the DRC decision and that she improperly condoned the conduct of the mailroom staff, *see* Doc. No. 11, p. 2; Doc. No. 14, p. 2 – and the Fifth Circuit has already affirmed that dismissal.  *Schwarzer*, 2021 WL 6060002, at *1.

[19]  As discussed above, this memorandum and recommendation provides the required notice to the parties that dismissal of Plaintiff's individual-capacity claim against defendant Smith based on qualified immunity.

- Plaintiff's procedural due process claim that defendants Echessa and Smith wrongly deprived Plaintiff of his property in violation of BP-03.91 should be DISMISSED with prejudice, because an adequate state post-deprivation remedy was available and because the dismissal of that claim has already been upheld by the Fifth Circuit;

- Plaintiff's procedural due process claims against defendants Echessa and Smith for failing to afford him notice and an opportunity to be heard during the DRC appeal should be DISMISSED with prejudice, because Plaintiff has failed to allege any facts plausibly suggesting that that he was denied the opportunity to be heard regarding the denial of the mailed items, and because BP-03.91 plainly allowed for Plaintiff to be noticed and heard;

- Plaintiff's individual capacity claims against all defendants should be DISMISSED with prejudice, because all defendants enjoy immunity from suit based on qualified immunity.

### E. Recommendation.

The undersigned recommends that the motion to dismiss (Doc. No. 52) should be

GRANTED IN PART and DENIED IN PART.

- All of Plaintiff's claims against defendants Collier, Lumpkin, and Echessa in their official capacities for declaratory and injunctive relief should be DISMISSED without prejudice.

- Plaintiff's First Amendment claims against defendants O'Daniel, Perryman, Miles, DeAyala, Francis, Johnson, Siv, Nichols, Burrow, Collier, Lumpkin, and Echessa in their official capacities for declaratory and injunctive relief based on the 2018 denial of Plaintiff's mail should be DISMISSED without prejudice.

- To the extent that defendants O'Daniel, Perryman, Miles, DeAyala, Francis, Johnson, Siv, Nichols, and Burrow seek dismissal of Plaintiff's First Amendment claims against them in their official capacities for declaratory and injunctive relief based on the provisions of BP-03.91, that motion should be DENIED.

- Plaintiff's First Amendment claims against defendants O'Daniel, Perryman, Miles, DeAyala, Francis, Johnson, Siv, Nichols, Burrow, Collier, Lumpkin, Flores, Echessa, and Smith in their individual capacities for monetary relief should be DISMISSED with prejudice; and

- Plaintiff's procedural due process claims against defendants Echessa and Smith in their individual capacities for monetary relief should be DISMISSED with prejudice.

After resolution of the dismissal motion, the undersigned recommends that Plaintiff's

First Amendment claim against defendants O'Daniel, Perryman, Miles, DeAyala, Francis,

51/52

Johnson, Siv, Nichols, and Burrow in their official capacities for declaratory and injunctive relief based on the alleged unconstitutionality of BP-03.91 remain and proceed.

### F. Notice.

The Clerk will file this Memorandum and Recommendation and transmit a copy to each party or counsel. Within **14 days** after being served with a copy of the Memorandum and Recommendation, a party may file with the Clerk and serve on the United States Magistrate Judge and all parties, written objections, pursuant to Fed. R. Civ. P. 72(b), 28 U.S.C. § 636(b)(1), and General Order No. 2002-13, United States District Court for the Southern District of Texas.

A failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within **14 days** after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415 (5th Cir. 1996) (*en banc*).

SIGNED on January 17, 2023.

MITCHEL NEUROCK
United States Magistrate Judge

# APPENDIX A



| TEXAS DEPARTMENT | NUMBER: | BP-03.91 (rev. 5) |
|---|---|---|
| OF | DATE: | June 25, 2021 |
| CRIMINAL JUSTICE | PAGE: | 1 of 15 |
| | SUPERSEDES: | BP-03.91 (rev. 4) February 25, 2020 |

# BOARD POLICY

**SUBJECT:**   **UNIFORM INMATE CORRESPONDENCE RULES**

**AUTHORITY:**   18 U.S.C. § 1716; Tex. Gov't Code §§ 492.013(a), 493.001, 493.006(b), 498.0042, 499.102(a)(12), 501.009; Tex. Penal Code § 38.111; BP-02.08, "Statement of Internal Controls"

Reference: AD-04.82, "Forfeiture of Good Conduct Time for Unauthorized or Prohibited Contact with a Victim," AD-03.72, "Offender Property," AD-14.09, "Postage and Correspondence Supplies," SATOM-02.36, "Rehabilitation Programs Division Correspondence Policy," YOP/Champions Program Operations Manual 02.05, "Prohibition Against Selling, Distributing, or Exhibiting Harmful Material to Minors," and SORP 02.06, "Rehabilitation Programs Division Correspondence Policy"

**APPLICABILITY:**   Texas Department of Criminal Justice (TDCJ)

**POLICY:**

The TDCJ facilitates written contact between inmates and the inmates' families and friends. All incoming and outgoing correspondence, except as otherwise provided in this policy, is subject to delivery, inspection, and rejection in accordance with the following rules.

**DEFINITIONS:**

The following terms are defined for the purpose of this policy and are not intended to be applicable to other policies or procedures.

"Altered Photo" is an image with content in violation of this policy that has been edited, including by removing or changing the contents of the image with a computer software program or other means.

"Business Day" is Monday through Friday, excluding holidays observed by the United States Postal Service.

"Contraband," for the purpose of inmate correspondence, is any physical item that presents a threat to the safety or security of the staff, inmates, institution, or public; this does not include any written material disapproved for its content.

"Director's Review Committee" (DRC) is the body of appointed TDCJ administrators with the authority to hear all appeals related to rejected correspondence, publications, and placements on negative mailing lists.

"eCommDirect" is a program made available through a link on the TDCJ website or the Texas.gov website by which inmate family and friends may purchase items and have the items delivered to inmates through the unit commissary. General population (GP) Level 4 (G4), Level 5 (G5), security detention Level 2 (2A) and Level 3 (3A), protective safekeeping (P6) and (P7), mental health, and commissary restricted inmates are not eligible to receive purchases through eCommDirect.

"Educational Materials" are books and literature targeted toward educational purposes.

"E-message" is an electronic written communication sent to a TDCJ inmate. This communication shall be treated in the same manner as incoming general correspondence.

"General Correspondence" is any mail sent to or from a general correspondent or not otherwise included in the definitions of legal, media, or special correspondence.

"General Correspondent" is any person corresponding with an inmate who is not included within the definitions for legal, media, or special correspondents.

"Indigent Status" is when a TDCJ inmate: (1) has less than a $5 balance in an inmate trust fund (ITF) account; (2) has a damaged or misplaced identification (ID) card; or (3) is on week one of lockdown status for more than seven consecutive days as outlined in AD-03.31, "Unit Lockdown Procedures."

"Legal Correspondence" is any mail sent to or from a legal correspondent.

"Legal Correspondent" is any attorney licensed in the United States or a legal aid society, which is an organization providing legal services, that contacts an inmate in order to provide legal services.

"Mail System Coordinators Panel" (MSCP) is the body designated to assist in the maintenance and coordination of the Uniform Inmate Mail System. The MSCP serves to bring uniformity to the decisions of the various units by providing technical assistance and rule interpretation; serves as the centralized authority for the review of publications for initial unit acceptance or denial; provides training for mailroom staff; conducts in-depth monitoring of all unit mailrooms; and submits periodic reports pertaining to the inmate mail system.

"Media Correspondence" is any mail sent to or from a media correspondent.

"Media Correspondent" is any member of the editorial and reporting staff of any newspaper or magazine listed in the *Gale Directory of Publications and Broadcast Media* or the *Editor & Publisher DataBook* or the editorial and reporting staff of any radio or television station. Other members of the media, including freelance members, may petition the DRC to be included within the definition of media correspondent.

"Reference Book" is a book, such as a dictionary or encyclopedia, that can be referred to for authoritative information. The book may contain useful facts or specially organized information.

"Sexually Explicit Image" refers to material in publications, photographs, drawings, or any type of image, which depicts sexual behavior, is intended to cause sexual excitement or arousal, or shows: frontal nudity of either gender, including the exposed female breast(s) with nipple(s) or areola(s); the genitalia, anus, or buttocks, or partially covered buttocks of either gender; the discharge of bodily fluids in the context of sexual activity; or sexual behavior from any vantage point. The chests of infants and pre-pubescent children are not considered breasts, unless further restricted by a treatment program policy.

"Special Correspondence" is any mail sent to or from a special correspondent. This includes correspondence from a rape crisis center that possesses a Memorandum of Understanding (MOU) with the TDCJ to provide emotional support to inmates.

"Special Correspondent" is any member of the Texas Board of Criminal Justice; the executive director; the deputy executive director; any division directors, deputy directors, Prison Rape Elimination Act (PREA) ombudsman, or wardens of the TDCJ; any court or district or county clerk of the United States or any of the states of the United States; any member of the legislature of the states or the United States; the President of the United States or the governor of any state of the United States; the attorney general of the United States or any attorney in the United States Department of Justice; the director or any agent of the Federal Bureau of Investigation or any official of any federal, state, or local law enforcement agency, including offices of inspector general, the directors of state departments of corrections, the Bureau of Prisons, and parole commissioners from other states; the attorney general or any assistant attorney general of any state; any member or commissioner of the Texas Board of Pardons and Paroles; any foreign consulate, which includes the consul general, vice consul, deputy consul, or honorary consul of any country of which the inmate is a citizen; or the Texas State Law Library or any county law library in the state of Texas.

"Stationery" is paper and envelopes, to include carbon paper, purchased through the unit commissary by the inmate, provided through the indigent correspondence supply program, or purchased by inmate families and friends through the eCommDirect program.

"Watch List" is a TDCJ mainframe generated list of inmates on special correspondence restriction, negative mailing lists, and names submitted by the Security Threat Group (STG) officer, unit safe prisons coordinator, the Office of the Inspector General, or unit administration.

"White Paper" is white, fragrance-free copy paper or lined notebook paper, not exceeding 8 1/2" x 11", that general correspondents may use to send correspondence to inmates. Various shades of white, such as ivory or cream, will not be allowed.

## PROCEDURES:

I.   General Rules and Instructions Regarding Correspondence

    A.   Permissible Correspondents

        An inmate may correspond with as many persons as the inmate chooses, except as restricted by this policy.

    B.   Restricted Correspondents

        1.   Other Inmates

        Inmates may not correspond with other inmates unless:

        a.   The inmates are immediate family members, which means parents, stepparents, grandparents, children, stepchildren, spouses, common law spouses, siblings, aunts and uncles, and nieces and nephews;

        b.   The inmates have a child together, as proven through a birth certificate, and the parental rights have not been terminated;

        c.   The inmates are co-parties in a currently active legal matter; or

        d.   The inmate is providing a relevant witness affidavit in a currently active legal matter.

        Prior to an inmate being approved to correspond, relationship issues shall be verified through the records office and legal matters shall be verified through the access to courts department.

        2.   Negative Mailing List

        Inmates shall be denied permission to correspond with persons on the inmate's negative mailing list. Persons on that list may be:

        a.   Minors whose parents or guardians object, in writing, to the correspondence, except an inmate's own child or stepchild, unless the child or stepchild is the inmate's victim as described in Section I.B.3, or there is a valid court order prohibiting contact after parental rights have been terminated;

    b.      Individuals who request, in writing, not to receive further correspondence from the inmate;

    c.      Inmates who request, in writing, not to receive further correspondence from an individual;

    d.      Victims of the inmate who request not to receive correspondence from the inmate or with whom the court prohibits contact during confinement; and

    e.      Individuals who have attempted to send contraband into the institution or otherwise committed a serious violation of these correspondence rules, as determined by the warden. A person who commits a serious violation of this policy may be prohibited from any further correspondence with a particular inmate and may be placed on a negative mailing list of persons with whom that particular inmate may not correspond. Within three business days of placement on a negative mailing list, a notice, accompanied by a statement of the reason for placement on the negative mailing list, shall be sent to the disallowed person and to the inmate, along with the procedures to appeal.

3.      Victims

    a.      In accordance with AD-04.82, "Forfeiture of Good Conduct Time for Unauthorized or Prohibited Contact with a Victim," the TDCJ prohibits unauthorized contact with a victim or a victim's family member by inmates if:

        (1)      The inmate is currently serving time for committing a crime against that victim;

        (2)      The victim was younger than 17 years of age at the time of the offense; and

        (3)      Written authorization for the contact was not obtained prior to the initiation of the contact.

    b.      The TDCJ also prohibits in AD-04.82 the unauthorized contact of a victim by a sex offender.

    c.      A court may prohibit an inmate from contacting, during the term of confinement, the victim of the offense of which the defendant is convicted or a member of the victim's family.

    d.    Inmates making unauthorized contact with victims shall be charged with a major disciplinary offense and, if the charge is sustained, may forfeit all or any part of accrued good conduct time credit if the inmate is not a state jail inmate. A state jail inmate shall be assessed a major disciplinary penalty if the charge is sustained.

    e.    An inmate may also be subject to criminal charges for improper contact with a victim.

4.    An inmate serving a sentence for which registration as a sex offender is required is prohibited from placing an advertisement soliciting a pen pal on an Internet website operated for that purpose, regardless of whether another person submits or pays for the advertisement for the inmate.

C.    How to Correspond

Inmates are allowed to receive mail from general correspondents on white paper. Mail received on colored, decorated, cardstock, construction, linen, or cotton paper will be denied. Letters sent to inmates may not contain uninspectable substances, such as perfume, stickers, lipstick, bodily fluid, powdery substances, or artwork using paint, glitter, glue, or tape. There is no restriction placed upon the length of incoming or outgoing correspondence; however, only 10 photos are allowed per envelope. Photos in excess of 10 shall generally be denied; however, the unit mailroom supervisor in coordination with the unit warden may approve more than 10 photos. All inmate mail shall be sent and received through duly authorized channels. Inmates shall not smuggle letters in or out of the institution.

1.    Authorized Channels

Inmates may only send First Class, Certified, Media Rate, or Priority United States mail through the inmate mail system. Inter-agency truck mail may only be used by inmates when communicating with TDCJ officials.

2.    Cash on Delivery (C.O.D.) Mail

Inmates may neither send nor receive C.O.D. mail.

3.    Packages

All outgoing packages shall not be sealed for mailing until inspected by TDCJ staff. Packages shall be free of contraband or material that constitutes a threat to security or cannot be lawfully sent through the mail. Outgoing packages may be mailed at a media mail rate if the contents of the package meet the media mail rate guidelines established by the U.S. Postal Service (USPS). These rules shall not apply to outgoing packages to

special, legal, and media correspondents, which shall be governed by the rules relating to such correspondence.

Inmates are not allowed to receive packages containing stationery supplies. Packages of publications may be sent to inmates by publishers or publication suppliers, including bookstores. The TDCJ shall accept delivery of packages from public carriers only, such as USPS, UPS, FedEx, or DHL. Special provisions are made for packages to be received from suppliers for craft shop operations. All incoming packages shall be subject to inspection. Inmates shall be notified when unauthorized packages have been denied.

4.      Greeting Cards

Inmates may receive greeting cards from general correspondents as follows:

a.      Cards must be postmarked within the two weeks before:

1.      Mother's Day;

2.      Father's Day; or

3.      December 25.

If the postmark date is not within the listed timeframes, the card will be denied.

b.      Greeting cards do not have to be of a certain theme, such as Mother's Day or Christmas.

c.      In addition, greeting cards will still be permitted throughout the year if sent from any of the five approved vendors: Ink Cards, Pigeonly, Shutterfly, Snapfish, and Touchnote. Greeting cards from these approved vendors are not required to be postmarked during the time frames listed above.

d.      Only one greeting card per envelope will be accepted.

5.      Return Address and Outgoing Correspondence

Each outgoing envelope or package shall include the sending inmate's commitment name, TDCJ number, unit name, current address, and postage. Inmates having a legal name other than the commitment name may also place that name in the return address. No other information shall be made part of the return address.

Inmates may not embellish outgoing envelopes with illustrations or written messages other than the return address, the name and address of the intended recipient, and a notation that the envelope contains legal, special, or media mail; photos do not bend; or fragile.

After consultation with the MSCP, mailroom officials shall not mail any outgoing correspondence from an inmate that mailroom officials reasonably believe will be deemed non-mailable by the USPS pursuant to 18 U.S.C. § 1716. This includes envelopes or packages having noxious odors or containing liquids or powders.

6.    Stationery

Any type of stationery, whether bought at the commissary, purchased through the eCommDirect program, or authorized for issuance to indigent inmates may be used for correspondence. Inmates shall not use homemade envelopes to correspond.

7.    Indigent Postage

Postage and stationery for mail from indigent inmates may be secured through the warden's designee. Postage and stationery shall be made available at regular intervals to indigent inmates, including those in security detention. Postage and stationery shall be furnished to an indigent inmate for correspondence to any special correspondent listed in these rules and to any attorney or legal aid society. An indigent inmate may use indigent postage to send five one-ounce domestic letters per month to general correspondents and five items per week to legal or special correspondents. An inmate may send extra letters to general, legal, or special correspondents using indigent postage if requested for a legitimate reason and approved by the warden.

Funds expended by the TDCJ for postage and stationery for indigent inmates shall be recouped by the TDCJ from funds later deposited in the inmate's ITF account.

D.    Publications

An inmate may receive publications in the mail only from the publishers or publication suppliers, including bookstores. Inmates ordering publications shall forward payments for subscriptions to individual publications with the order. Inmates shall not receive publications of any kind on a trial basis with payment postponed. Persons desiring to give publications directly to individual inmates must have the publications mailed from publishers or publications suppliers,

including bookstores or online booksellers. Publications received by inmates may be in languages other than English.

E.     Reference Books and Other Educational Materials

An inmate may receive reference books and other educational materials from volunteer organizations that operate the following types of programs: literacy and education, life skills, job skills, drug and alcohol rehabilitation, support group, arts and crafts, and any other program designed to aid inmates in the transition between confinement and society and to reduce recidivism, regardless of whether the organization provides those programs to inmates assigned to units operated by the TDCJ. These reference books and educational materials shall comply with content requirements contained in this policy.

II.     Special and Media Correspondence

A.     Permissible Correspondence

Inmates may send sealed and uninspected letters directly to special and media correspondents. All incoming correspondence from any special or media correspondent shall be opened and inspected only for contraband, except under the special circumstances noted in these rules. The inspection shall be in the inmate's presence. All incoming special correspondence envelopes shall be prominently stamped as received by the TDCJ or cancelled so that postage-free government envelopes cannot be reused.

B.     Exceptions

In individual cases, where reasonable suspicion exists to believe the correspondence rules or the law is being violated, incoming or outgoing special or media correspondence may be opened and inspected for contraband and content upon obtaining written permission of the Correctional Institutions Division (CID) director or designee.

III.     Legal Correspondence

A.     Permissible Correspondence

To facilitate the attorney-client privilege, an inmate may send sealed and uninspected letters directly to legal correspondents. No correspondence from an inmate to any legal correspondent shall be opened or read. All incoming correspondence from any legal correspondent shall be opened and inspected for contraband only. The inspection shall be in the inmate's presence. No correspondence to an inmate from any legal correspondent shall be read.

B.    Exceptions

When an inmate violates the law or the correspondence rules using legal correspondence, the inmate may have legal mail privileges suspended except to the inmate's attorney of record, upon obtaining written permission of the CID director or designee. The attorney of record must submit a written statement naming them as the attorney of record for the inmate. The CID director shall approve the restriction of legal correspondence privileges.

IV.    Handling Inmate Correspondence

A.    Content Inspection of General Correspondence

All general correspondence shall be subject to the right of inspection and rejection by unit mailroom staff. All outgoing or incoming letters to and from inmates and enclosures such as clippings, photographs, or similar items, shall be disapproved for mailing or receipt if the content falls as a whole, or in significant part, into any of the categories listed below:

1.    Contains threats of physical harm against any person or place or threats of criminal activity;

2.    Threatens blackmail or extortion;

3.    Concerns sending contraband in or out of the institution;

4.    Concerns plans for escape or unauthorized entry;

5.    Concerns plans for activities in violation of institutional rules;

6.    Concerns plans for future criminal activity;

7.    Uses code and its contents are not understood by the person inspecting the correspondence;

8.    Solicits gifts of goods or money under false pretenses or for payment to other inmates;

9.    Contains a graphic presentation of sexual behavior that is in violation of the law;

10.    Contains a sexually explicit image;

11.    Contains an altered photo or a photo that conceals or hides the face of the individual photographed in a manner that prevents identification of that individual;

12.     Contains information, which if communicated, would create a clear and present danger of violence or physical harm to a human being; or

13.     Contains records or documentation held by the TDCJ that are not listed in the attachment to the TDCJ *Public Information Act Manual* Chapter 2.

B.     Contraband in General Correspondence

If contraband is found in an incoming letter or publication, the contraband shall be removed from the letter or publication, if possible. If the contraband cannot be removed from the letter or publication, the letter or publication shall not be delivered to the inmate.

C.     Contraband in Legal, Media, or Special Correspondence

If an enclosure constituting contraband is found, the contraband shall not be delivered to the inmate.

D.     Notices

The inmate and the sender or addressee shall be provided a written statement of the disapproval and a statement of the reason for disapproval within three business days after receiving the correspondence. The notice shall be given on Correspondence Denial Forms. The inmate shall be given a sufficiently detailed description of the rejected correspondence to permit effective use of the appeal procedures. The inmate, sender, or addressee may appeal the mailroom staff's decision through the procedures outlined in this policy. The inmate or sender may submit a written argument as to why the item should not be denied for the DRC's consideration.

E.     Record of Legal, Special, and Media Correspondence

The mailroom shall maintain records showing the source and destination of all incoming and outgoing legal, special, and media correspondence.

F.     Content Inspection of Publications

All publications are subject to inspection by the MSCP and by unit staff. The MSCP has the authority to accept or reject a publication for content, subject to review by the DRC. The MSCP shall render decisions on publications reviewed within two weeks of receipt at the MSCP office. Unit mailroom staff shall review books not previously reviewed and render a decision within two weeks of receipt at the mailroom. Inmates do not have to be notified when magazines or books are being held for review. Publications shall not be rejected solely because the publication advocates the legitimate use of inmate grievance procedures, urges

inmates to contact public representatives about prison conditions, or contains criticism of prison authorities.

1.      Rejection Due to Content

A publication may be rejected if:

a.      It contains content that could facilitate an escape;

b.      It contains information regarding the manufacture of explosives, weapons, or drugs;

c.      It contains material that a reasonable person would construe as written solely for the purpose of communicating information designed to achieve the breakdown of prisons through inmate disruption such as strikes, disturbances, riots, or STG activity;

d.      A specific determination has been made that the publication contains graphic presentations of sexual behavior that is in violation of the law, such as rape, incest, sex with a minor, bestiality, or necrophilia;

e.      It contains material on the setting up and operation of criminal schemes or how to avoid detection of criminal schemes by lawful authorities charged with the responsibility for detecting such illegal activity; or

f.      It contains sexually explicit images. However, subject to review by the MSCP on a case-by-case basis, publications constituting educational, medical, scientific, or artistic materials, including anatomy medical reference books, general practitioner reference books or guides, *National Geographic*, or artistic reference material depicting historical, modern, or post-modern era art, may be permitted.

2.      Notice

Written notice shall be provided to the inmate within three business days of receipt of any book requiring further review by the DRC. Publications approved by MSCP shall be delivered to inmates within three business days.

3.      List of Disapproved Publications

A list of publications disapproved for receipt by inmates during the last two months shall be noted on the Law Library Holdings List at each institution. The list shall be updated every month.

G.      Processing Incoming and Outgoing Inmate Mail

All mail and e-messages, including delivery, pick-up, or notifications, shall be processed by TDCJ employees or privately operated facility staff only and during normal business hours whenever possible. An inmate shall not handle another inmate's mail, except to assist staff when loading and unloading mail in bulk deliveries. Staff shall maintain direct supervision of these inmates.

All incoming mail, except packages, shall be delivered within two business days of receipt. Incoming packages shall be delivered within three business days of receipt.

All outgoing mail, except packages, shall be delivered to a USPS employee within two business days. Outgoing packages shall be delivered to a USPS employee within three business days.

Records shall be maintained to indicate the source and destination of outgoing mail from death row inmates.

Exception: Incoming and outgoing mail for inmates whose mail is being monitored may be processed within three business days of receipt, if necessary, to allow unit staff to properly examine the correspondence.

H.      Forwarding of Mail

Mail received shall be forwarded to an inmate immediately in the event the inmate has left the unit and a forwarding address is available. Newspapers shall be forwarded by truck mail for seven days and other subscriptions shall be forwarded by truck mail for 45 days after an inmate is transferred between TDCJ institutions if truck mail is available between the two institutions. Should an inmate leave the unit of assignment for temporary medical treatment, correspondence, newspapers, and magazines shall be held by the unit mailroom until the inmate returns.

I.      Mailrooms

All unit mailrooms shall be open and provide mail service Monday through Friday, except on holidays recognized by the USPS.

J.    Treatment Programs

The Substance Abuse Treatment Program, the Sex Offender Treatment Program, the Champions Program for youthful inmates, and other treatment programs, as approved by the CID director and the Rehabilitation Programs Division director and maintained by the MSCP, may have more restrictive content-based requirements for general correspondence and publications, as long as those more restrictive requirements are directed at the treatment goals and needs of the treatment program or serve to keep the agency in compliance with established laws governing access to certain types of publications by minors.

V.    Review Procedures for Denied Items

A.    Handling of Denied Items

Any incoming or outgoing correspondence or publications that are rejected shall not be destroyed but shall remain with the mailroom staff subject to examination and review by those involved in the administration of the appeal procedures outlined herein. Upon completion of the appeal procedures, if the correspondence or publication is denied, the inmate may request that it continue to be held in the custody of the mailroom staff for use in any legal proceeding contemplated by the inmate, or that it be disposed of in one of the following manners, unless security concerns mandate that the inmate not have a choice in the disposition:

1.    Mail the publication or correspondence to any person at the inmate's expense; or

2.    Destroy the publication or correspondence, only with the inmate's written permission.

B.    Correspondence and Publication Appeal Procedure

1.    Appeal Procedures

a.    Correspondence and Placement on Negative Mailing List

A written notice of appeal, including justification, shall be sent to the DRC within two weeks of notification of the denial of correspondence or placement on the negative mailing list.

b.    Books and Magazines

Books and magazines that have been denied shall be automatically appealed. A written justification shall be sent to the DRC within three business days of rejection.

2.      DRC Decision

The DRC shall render its decision within two weeks after receiving the appeal and shall issue written notification of the decision to the parties involved within two business days.

The publisher, sender, or other correspondent may challenge the DRC decision by providing written justification along with copies of the denied content to the MSCP.

3.      Delegation

The DRC chairman may delegate decisions regarding correspondence and publication denials to the MSCP, which shall be governed by the guidelines applicable to the DRC regarding appeals.

_____
Patrick L. O'Daniel, Chairman[*]
Texas Board of Criminal Justice

---

[*] Signature on file